THE STATE OF KANSAS, *on the relation of S. B. Bradford, Attorney General,* v. LEWIS W. FULTON, *as Clerk of the District Court of Garfield County, et al.*

1. COUNTY-SEAT ELECTION — *Evidence of Corrupt Purpose.* The refusal of an election board composed exclusively of the partisans of one town in a county-seat election to permit representatives of the opposing town to be present in the polling-room during the reception of the vote is evidence of a corrupt and dishonest purpose in the conduct and result of the election. (*The State, ex rel., v. Malo,* ante, p. 54.)

2. FRAUDULENT PURPOSE — *Evidence.* The failure of the judges and clerks of an election for the location of a county seat immediately after the close of the vote to make certificates of the number of votes polled, and post one on the outside of the polling-place and forward the other under cover to the county clerk, is evidence of a fraudulent purpose. (*The State, ex rel., v. Malo,* ante, p. 54.)

3. EVIDENCE *of Dishonest Purpose.* Where an election board in one township in a county-seat election continues the counting of the ballots until the full returns are received from the election in all the other precincts of the county, it is some evidence of a corrupt and dishonest purpose.

4. TOWNSHIP — *Election Returns, When Entirely Ignored.* The returns of an election held in a certain township for the permanent location of the county seat must be entirely ignored when it is shown that the election board would not permit anyone of the opposite party to be in the polling-room during the reception of the votes; that the board failed or neglected to make the certificate required by law as to the number of votes that were polled, and to post it on the outside of the polling-room; when it is shown that the election board in one township continued the counting of the ballots until returns were received from all other precincts in the county; that by the fraud of

the judges and clerks, assisted by others, a greater number of votes were returned than there were actual votes cast; that by the fraud of the judges and clerks fraudulent ballots were deposited in the ballot-box during the counting of said ballots, and forged poll-books were made to correspond with the number of such fraudulent ballots, and that such fraudulent votes were so mixed up with honest votes that it could not be determined how many were honest and how many fraudulent, and no evidence was offered showing the result of the vote of the electors possessing the necessary qualifications.

### Original Proceeding in Mandamus.

THE facts are fully stated in the opinion, filed at the July, 1889, session of the court.

*J. M. Johnson, Brown, Bierer & Cotteral,* and *Rossington, Smith & Dallas,* for plaintiff.

*Johnson, Martin & Keeler, Edwin A. Austin,* and *F. R. McAliney,* for defendants.

Opinion by CLOGSTON, C.: This is an action brought originally in this court for the purpose of compelling Lewis W. Fulton, clerk of the district court, to hold his office at the town of Eminence, in Garfield county. After the return of the writ by the defendant, by stipulation Clarence Van Patten, E. W. Dunn, J. L. Bennett, J. E. T. Kephart and N. A. Johnson were made defendants, and afterward an issue was joined between all of the defendants by their answer and return. The first election for permanent county seat and for county officers was held on November 8, 1887; and after this election, and on November 15, 1887, an alternative writ of *mandamus* was issued, commanding the defendant Fulton to forthwith hold his office and transact the county business at the town of Eminence. The question now involves the validity of the election for permanent county seat. The plaintiff alleges and claims that at said election so held in Garfield county for the purpose of designating the permanent location of the county seat the town of Eminence received a majority of all the legal votes cast thereat, and that by the fraud of the election board of Center township a larger number of votes was returned as hav-

ing been cast at that township than there were legal voters who voted at said election, and that by the fraudulent return of said votes and the canvass of the same the town of Ravanna was declared to have received a majority of the votes at said election for the permanent county seat. The returns from Garfield county as canvassed show, for county seat, Ravanna, 467 votes; for Eminence, 422 votes.

Several charges and counter-charges of fraud and corruption have been made by the plaintiff and defendants, but at the final hearing of the action by agreement of the parties the matter was left to be determined upon the validity of the election in Center township alone. The plaintiff now contends that the election board at Center township fraudulently and wrongfully conducted the election, and fraudulently and wrongfully put tickets in the box in excess of the number of persons who voted at that election to the number of 86, and forged the poll-books to the extent of 86 names, and that the county clerk falsely and fraudulently added to the registration books the names of 86 persons so alleged to have voted at said election. The plaintiff also charges that the election board refused to allow a representative of the town of Eminence on the election board, and during the time of the voting refused to permit a representative of the town of Eminence in the polling-room, and also refused to allow or permit a candidate on the Eminence ticket to be present in the polling-room during the time of the reception or counting of the ballots, and at the close of the polls fraudulently neglected to post the number of votes cast on the outside of the door of the polling-room, as provided by law, and fraudulently continued the counting of the ballots until after the full returns from the remainder of the county had been known, and then falsely and fraudulently stuffed the ballot-box to the extent of 86 ballots, and forged the poll-book to make it correspond to the 86 ballots so fraudulently placed in the ballot-box.

It is not denied by the defendants but that the charge in relation to the manner in which the election board was formed and the polls opened is true, that representation was denied

to the Eminence people on the board, and that no Eminence man or candidate, or any of their friends, were permitted in the polling-room during the reception of the ballots. It is admitted that all the Eminence men were excluded from the window at the polling-place shortly after the polls were organized, except Dr. Crow; and it is also not denied but that they refused to allow any friend of Eminence, or on behalf of any candidate on the Eminence ticket, to be in the room during the canvassing of the vote, other than Dr. Crow; neither is it denied but that the county clerk, prior to the election and afterward, refused to allow friends of Eminence to inspect the registration books, or the poll-books after the election, or to have copies of either, and that the first time the friends of Eminence were able to see the registration list or the poll-books was when they were brought in at the taking of the testimony before the commissioner in obedience to a subpena issued by him. It is further admitted that Dr. Crow, during the time of the counting of the ballots, was not permitted to inspect or see the poll-books to ascertain the number of names of the voters; and it is further admitted that after 260 ballots had been counted out, Dr. Crow challenged the honesty of the election and charged the board with fraud in stuffing the ballot-box; and at the close of the election and at the canvass, it was charged by Crow and friends of Eminence that the ballot-box had been stuffed to the extent of at least 86 votes; and it is also admitted that no notice was posted on the door of the polling-room at the close of the election, of the number of votes cast at the election; and it is also admitted that a wire fence was constructed around the polling-place, about 50 feet from the building, and that entrances were left through which voters could go in, one at a time, and a place of exit, and that armed guards were placed at this entrance to prevent more than one from entering the inclosure at a time; and that at the time the polls were opened the Eminence people were allowed three persons at the window where the tickets were received, to challenge voters and to make a tally-list of persons who voted, but at about 10 o'clock two of these persons

were removed by the guard or deputy sheriffs, and Dr. Crow was alone permitted at the window to challenge or make a list, and after the close of the polls he was permitted to remain in the polling-room during the counting of the votes. The evidence further shows that he, together with the other two men, kept a record of the number of persons voting, their names and voting numbers.

The evidence produced by the plaintiff upon the question of fraud presents substantially the following facts: At the close of the polls, Dr. Crow's record or tally showed 259 votes by number, and it was there by him announced that the total vote at the close of the polls was 259. It was afterward discovered that Crow's list contained 260 names. It was then announced from the polling-room by some member of the board, and by other persons, that the tally-sheets and poll-books showed 260 persons voting at that election, and it was generally conceded and known that evening that the total number of votes was 260. The evidence further discloses the fact that during the day a person when voting would ask the board what his number was, and they would give him his number as appearing upon the poll-book, and these numbers agree with the numbers Crow had on his list, made on the outside. At other times a dispute would arise between the clerks as to the number of voters, and they would make the correction and announce such correction, and also ascertain the number Crow had on his book, kept on the outside of the window, and thus during the day at several intervals these records were compared and known. In support of the record kept by Crow, and for the purpose of impeaching the returns made by the board, thirteen witnesses were introduced who testified that they voted at that election, and gave the name of the person who voted immediately before or immediately after them, and several also gave their number when voting, and by a comparison of their testimony with Crow's record it is shown that his record corresponds with the statements of these witnesses, but does not correspond with the poll-books and return by the board.

Again, for the purpose of contradicting and impeaching the returns, Thomas Patterson was called as a witness, and testified that one Peter Parker was a legal voter at the town of Ravanna; that he was a barber and worked in a barber shop, and was there on election day, and acted as deputy sheriff; that during the day a photograph was taken of a group of people in the street, and that Parker held a child in his arms when said picture was taken. The photograph is also in evidence. Dr. Crow was called as a witness, and testified positively that Peter Parker voted that day. Crow's record shows that Parker voted No. 34m, while the poll-books returned by the board do not contain the name of Peter Parker.

Again, to contradict this return, one J. D. Montgomery was presented by the plaintiff as a witness, who testified that he was a voter at said election, and voted, and that he did not vote for Eminence or Ravanna for the county seat. James Cross, one of the judges of election, testified that he failed to erase from his ticket either Ravanna or Eminence, and that his vote was not cast for either of those places for county seat, and was not counted for either place, while the return made by the board shows that all the voters returned as having voted at the election voted either for Ravanna or Eminence for the county seat.

Again, for the purpose of impeaching said return, plaintiff placed upon the witness stand 96 persons who show themselves to have been qualified electors, and who testified that they voted at that election, and that they cast their ballots for Eminence for county seat, while the returns show but 83 votes for Eminence. Plaintiff also caused a subpena to be issued and placed in the hands of the marshal, appointed by the court to serve process, for the 86 persons claimed by the defendants to have voted at said election, in excess of the 260 as shown by Crow's list. This subpena was returned by the officer with the showing that said persons could not be found in Garfield county.

The plaintiff also produced one F. M. Francis, who testified that he was a resident of Ravanna, a deputy sheriff on the day of the election, and was present and voted at the election, and voted for Ravanna for county seat; that the board of election

continued in session all night during the night of the 8th and until 4 o'clock of the evening of the 9th before making a final canvass of the votes, and that on the morning of the 9th full returns from the entire county had been received, and the majority ascertained outside of the township of Center to be a majority in favor of Eminence for the county seat. He also testified that on the evening of the 9th, after the canvass had been made and declared, the board, or the clerks and judges of election, met at the store building of one Crow for the purpose of fixing up the returns and poll-books; that witness looked in at the back window of the store and there saw the judges and clerks engaged in writing what seemed to be poll-books and tally-sheets; that he also saw a book that looked like a registration list, and papers that looked like tickets. He also testified that Cross told him in the evening while at supper that he was going up to town to fix up the papers, referring to the election returns.

Plaintiff also produced one W. A. Shirley, who in a deposition testified that he was a lawyer by profession, and lived at the time of the election at Ravanna; that he was present at the election, and that tickets were prepared in his office during the day of the election to put in the ballot-box, and that the same were delivered to one of the judges of the election and by him placed in the ballot-box during the time the votes were being counted, and that these 86 ballots were fraudulently placed in the ballot-box; that on the night of the 9th, the night after the canvass of the votes of Center township was made, the board and clerks met at Crow's store, and afterward for better security came to his office, being the law office of McAliney and this witness, and there the board proceeded to make out new poll-books, so as to place the 86 names to correspond with the 86 tickets that had been by the board fraudulently placed in the ballot-box during the election and counting; he also states that it was generally talked over between the persons interested in the location of the county seat at Ravanna as to the manner of securing the majority of votes by falsely placing

ballots in the ballot-box, and by forging returns to correspond therewith.

The defendants denied the fraud alleged by the plaintiff, and they also produced the election board and other persons connected with the election, and friends of Ravanna, who testified that there was no fraud perpetrated by the board, and that the election was fair in every respect. They also offered evidence tending to contradict the evidence given by the plaintiff not admitted, and evidence tending to impeach the statements made by Francis and by Shirley; and also evidence tending to show that Shirley was intoxicated at the time, and did not know what took place at his office on the evening of the 9th. They also produced a large number of witnesses and attempted to account for the 86 names that the plaintiff alleged were fraudulent, but of these 86 names not one of the persons is produced as a witness to testify that he was present and voted at that election, although there was a large number of witnesses who testified that they were acquainted with some of the 86 persons, that they had formerly lived at Ravanna, or had been stopping there, some transient, some a number of months, and that they were seen there at Ravanna at the time of the election, and some on election day, and some on days after the election; but no one is able to say from personal knowledge that these 86, or any of them, voted at that election. There was strong evidence, however, tending to show that a number of these persons actually did vote at that election, but as to the greater part of these 86 there is no evidence to show that they were residents and electors of Garfield county, or that they were present or voted at that election; and as to a number of them the defendants admit that they were not there — one being in Colorado at the time, and another in Texas, and a few others whom they do not claim were present in person to vote at that election, but the claim made by the board and friends of Ravanna is that each ballot so recorded and the name appearing upon the poll-book represent an actual person who appeared and voted and gave the name appearing upon the poll-book, and that if any of these 86 persons were not

actually present, then some one representing those persons voted in their names, and that this was done without knowledge on the part of the election board.

The evidence to establish these facts runs through more than 4,000 pages of record. The record contains a large amount of evidence not pertinent to the issues as now narrowed down. From this testimony and admissions it is clear: First, that the county clerk refused to permit an inspection of the registration books, or to give a copy of the same to the friends of the town of Eminence. Second, that the county clerk refused to permit an inspection of the poll-books after the canvass by the board of county commissioners, or to furnish a copy of the same. Third, that the board was organized without any representation on the part of the friends of Eminence, and that after its organization the board wrongfully refused admission to the polling-room during the reception of the votes of a representative of Eminence, or on behalf of any candidate for office on the Eminence ticket. Fourth, that at the close of the polls they wrongfully failed and refused to post the number of votes cast on the outside of the door of the polling-room. Fifth, that the board wrongfully and fraudulently continued to count until after the returns from the remaining five precincts were brought in and the majority in favor of Eminence in such townships was ascertained. Sixth, that the board fraudulently concealed the fact that the poll-books contained the names of 346 voters until after the entire count was made. Seventh, that the board fraudulently counted all the votes cast in favor of either Ravanna or Eminence, when they well knew that at least two ballots contained no name for permanent county seat. On these points there can be no controversy. It is not even fairly denied in the evidence by the defendants or the election board.

The remaining question is: Is there a preponderance of the evidence with the plaintiff to establish the fact that the poll-books were forged and the ballot-box stuffed? The direct evidence of this fact is somewhat meager, and did we have to determine upon that testimony alone we would hesitate be-

fore finding a preponderance for the plaintiff. In the first place, the evidence of Francis is not of itself satisfactory, and in many respects inconsistent, and his testimony is strongly denied by the board and by the circumstances. Again, as to the direct evidence of Shirley, it must be remembered that his evidence at best is only the testimony of an accomplice in the crime, for whatever fraud was perpetrated he was as guilty as any of the others. His testimony was taken without cross-examination, and while it corroborated that of Francis, it is denied by the board and many other persons, and as we said before, had we to determine this question upon the testimony of Francis and Shirley alone, we would hesitate before finding for the plaintiff; but when all the evidence that tends to impeach the returns from this township is considered, and the evidence tending to support and bolster up the evidence of Francis and Shirley is weighed, we are no longer left in doubt as to what the result should be. It is admitted that at least a part of the election board were at Crow's store on the evening of the 9th; it is admitted that they were all at the office of McAliney & Shirley later in the evening, and these, coupled with the fact of the suppression of the number of votes pretended to have been cast; the fraudulently preventing any inspection of the poll-books and registration books; the refusal to post upon the door of the polling-room, at the close of the election, the number of votes cast; the refusal to admit into the polling-room the friends of the opposing candidates and place; the refusal to permit Dr. Crow to see the number of votes on the poll-books when he charged the board with having stuffed the ballot-box, when it was found that the box contained more than 260 ballots; the fact that Dr. Crow kept a tally at the door, which was admitted by the board to have been kept correctly, during the day, and that the board corrected its tallies from it; the fact that the poll-books contained 86 more names than Crow's list;—all these tend to establish the fact that on the part of the Ravanna partisans no pretensions to fairness or honesty were indulged in by the election board or the friends of Ravanna, and all this tends to corroborate the testi-

mony of Francis and Shirley as to the manner in which the fraud was perpetrated, and it all fairly establishes the fact that fraud was perpetrated, the ballot-box stuffed, and that the poll-books were a forgery.   Whether Shirley's and Francis' testimony is true or not, as to the time when this forgery was made, is not material; the fact that it was done is established outside of and beyond their testimony, and while they may have been mistaken as to the time when it was done, the evidence fairly establishes it as a fact.   When the evidence is admitted that at least two tickets did not contain the name of either Ravanna or Eminence, yet with that knowledge the board counted those tickets for either one or the other of those places, its returns are impeached.   When it is shown that at the close of the polls Dr. Crow's statement in answer to an inquiry was that 259 or 260 votes were polled, and upon inquiry of the board it confirmed the statement, it is a strong presumption against the return that was afterward made, showing 346 votes instead of 260.

Again, it is shown by the plaintiff that ninety-six voters testified that they voted at that election, their names appearing upon the registration list and upon the poll-books and upon Crow's list, and they testified that they voted for Eminence, while the poll-books returned by the election board show but 83 so voting.   These facts are strong circumstances tending to establish a corrupt purpose on the part of the election board and managers of the election to defeat the honest will of the majority of the voters of Garfield county.   The defendants, however, insist that they have by a preponderance of the testimony established the fact that Dr. Crow's list is not correct, and that the return by the board is correct; and in their argument they say they have shown that before the election, on the day of the election, and afterward, these 86 persons lived in Ravanna; that they were there and had registered, and were legal voters; and they say when they have done that, that it is not necessary for them to go farther and show that they voted at the election; that the interest in the county-seat election at Ravanna was of such a character that it would have

brought to the polls every person who was entitled to a vote, and if they have shown that these men were all residents of Ravanna on the day of the election, then the presumption must be that they voted, and the returns correct.    There is force in this argument, but their conclusions are not supported by the evidence.  In the first place, they account for but a few of these people being present on the day of the election, and the evidence as to their having been present on that day is in many instances not positive.    Persons testified that the man was there before election, and the witness thinks he saw him on election day.    Others, that there were such men there about election-time, and before and after.    It is true as to a few of these names that there was strong evidence showing them to have been present on the day of the election, but it must be remembered that of the 86 persons so sought to be accounted for, not one was produced to testify that he was present and voted at that election; in fact, very few of them were accounted for.    No one was able to tell where they came from nor where they went.    They were here a few days after election, or they were not seen after the election, or they moved away directly after the election: these are the answers to the inquiry as to what became of those persons; and we think it a singular proposition for the defendants to make, that out of the population of a village of a few hundred people 86 men who had lived in Kansas for six months and in the county of Garfield for thirty days prior to the 8th day of November could all go away and leave behind them no trace by which they might have been found and at least some of them produced at the trial of this case, when it is remembered that the taking of the testimony extended over a period from the 19th of January, 1888, to the September following.    No expense or pains seems to have been spared by either the plaintiff or the defendants to produce all the testimony possible tending to destroy or sustain the election in Center township; in fact, the permanent location of the county seat depended upon this testimony; the title of the several county officers to the places to which they were returned elected also depended upon this

testimony, and yet with all this expenditure of time and money, and the interests at stake, no person is produced to testify that he was one of the 86 persons and voted at that election, and no positive testimony was given that any of the 86 actually voted on the day of the election.   In the face of this showing it is hardly consistent for the defendants to claim that there was a fair election, or fair returns made from Center township.

Again, no attempt is made by the defendants to prove the number of votes actually cast in favor of Ravanna in Center township for the permanent county seat; it therefore must follow that the returns from Center township must be disregarded so far as the defendants are concerned, and the actual votes proven for Eminence be counted.   So, placing it upon the basis of the actual votes cast at the election, it can fairly be said that of all the votes actually cast, Eminence received a majority of such votes.

It is therefore recommended that the peremptory writ of *mandamus* be allowed.

By the Court: It is so ordered.

All the Justices concurring.