No. 35,118

WILLIAM H. BURKE, *Plaintiff*, v. THE STATE BOARD OF CANVASSERS OF THE STATE OF KANSAS, consisting of PAYNE RATNER, Governor, FRANK J. RYAN, Secretary of State, GEORGE ROBB, Auditor of State, WALTER E. WILSON, Treasurer of State, and JAY S. PARKER, Attorney General, *Defendants.* (MRS. R. P. EVANS, ELLA WOOD, DAVID M. BODDINGTON, ELLA BODDINGTON, CHARLES F. McCAMISH, H. BREWSTER POWERS, GRANVILLE M. BUSH, HELEN BUSH, JOSEPH B. BREICHLEIN, LAVERN ALBERT BAMBERG and DR. C. MART MONTEE, *Interveners.*)

(107 P. 2d 773)

Opinion filed December 7, 1940.

*Jerry Driscoll*, of Russell, *D. C. Hill*, of Wamego, *George H. West*, of Kansas City, *George B. Collins*, of Wichita, and *E. R. Sloan*, of Topeka, for the plaintiff.

*Jay S. Parker*, attorney general, *C. Glenn Morris*, assistant attorney general, and *Chester Stevens*, special assistant attorney general, for the defendants.

*Hal E. Harlan*, of Manhattan, for Mrs. R. P. Evans; *J. H. Brady* and *Ernest H. Yarnevich*, both of Kansas City, for Ella Wood; *Edward M. Boddington*, *Wm. H. McCamish*, *Edward H. Powers*, all of Kansas City, and *W. C. Jones*, of Olathe, for David M. Boddington, Ella Boddington, Charles F.

McCamish, H. Brewster Powers, Granville M. Bush, Helen Bush and Joseph B. Breichlein; *Hart Workman*, of Topeka, for Lavern Albert Bamberg; and *C. A. Burnett*, of Pittsburg, for Dr. C. Mart Montee, interveners.

The opinion of the court was delivered by

THIELE, J.: This is an original proceeding in mandamus brought by plaintiff against the state board of canvassers to compel that board to permit plaintiff to examine certain affidavits returned to the secretary of state in connection with absentee ballots, and as more specifically referred to hereafter. Upon the filing of the application, we made a rule to the defendant to show cause why a peremptory writ should not issue. The defendant has filed its combined motion to quash and answer, and a number of electors have been permitted to intervene.

The application for the writ sets forth the status of the defendant and its official composition; that plaintiff was the Democratic candidate for the office of governor and his name appeared on the official ballot at the election held on November 5, 1940, and that Payne Ratner was the Republican candidate for that office; that prior to that election and by virtue of G. S. 1935, ch. 25, art. 11, ballots were sent by the secretary of state, on application of persons claiming to be electors of Kansas, to divers places outside of Kansas; that about 7,500 of such ballots were mailed out and about 7,000 were voted and returned; that the defendant board is now canvassing such ballots; that the affidavits attached to the ballots, as provided by statute, have by that board been segregated from the ballots, and plaintiff, through his representatives, has demanded opportunity to inspect the affidavits to determine whether or not they are in accordance with the statute; that the defendant has refused to permit plaintiff or his representatives to examine or inspect the affidavits and it is necessary for plaintiff to examine the affidavits to determine whether or not the persons executing the same and returning the ballots are qualified electors of the state of Kansas; that there is no valid excuse for the refusal of the defendant board to permit examination of the ballots (probably "affidavits" was the word intended), and this plaintiff has no other adequate remedy than through proceedings in mandamus. The prayer is for a writ of mandamus to compel the defendant board to permit plaintiff, or his duly authorized representatives, to examine the affidavits.

The motion to quash and the answer of the defendant board may be summarized: (1) The court is without jurisdiction of the parties

or of the subject matter. (2) The motion for the writ shows on its face insufficient facts to constitute the basis for a writ of mandamus. (3) The plaintiff is not entitled to the writ for the reason he has a plain and adequate remedy at law. (4) That the defendant board, under the statute, possesses right, power and discretion to determine validity of any ballots cast by electors of the state under the above-mentioned statute, and in connection therewith the defendant alleges that the statutes do not authorize or require the board to admit any candidate or his representative to witness either the count of the ballots or the qualifications of the electors who cast such ballots, and that under the statute the county clerk of each county is vested with the absolute power to determine the qualification of any resident elector for the purpose of casting an absentee ballot, and his decision is final and conclusive and binding on the secretary of state and the defendant board. It was further alleged the board is vested with power of discretion to determine whether such an elector has made his affidavit and marked his ballot in accordance with the statute, and the decision of the board is final and there is no appeal therefrom except by reason of the statutes providing for a legal contest of the election; that the board cannot be sued without consent of the state and there has been no such consent; that there is a presumption the board has performed its duties in a lawful manner and there is no allegation it has acted otherwise in counting the out-of-state absentee ballots; that if the writ issue it would render nugatory provisions of statute relative to secrecy of the ballot; that the purpose of the affidavit is to enable the board to identify the voter with the person certified by the county clerk as a qualified elector, and that the board is vested with a sound discretion to determine whether the affidavit is in the form prescribed by law and such discretion cannot be controlled by mandamus.

The various applications to intervene set forth the reasons why, and where the interveners voted, and that each is entitled to have his vote kept and maintained secret from all persons other than the state board of canvassers, and that his right to such secrecy should be protected.

For our purposes, the statute, with reference to the issuance of a writ of mandamus, reads:

"The writ of mandamus may be issued by the supreme court . . to compel the performance of any act which the law specially enjoins as a duty resulting from an office, trust or station; but though it may require an inferior

tribunal to exercise its judgment, or proceed to the discharge of any of its functions, it cannot control judicial discretion." (G. S. 1935, 60-1701.)

Under the statute, it has been frequently held that the applicant for the writ must show a clear legal right to have the thing done which is asked for, and it must be the clear legal duty of the party sought to be coerced to do the thing he is called upon to do. (*Swartz v. Large,* 47 Kan. 304, 27 Pac. 993; *National Bank v. Hovey,* 48 Kan. 20, 28 Pac. 1090; *Hughes v. Parker,* 63 Kan. 297, 65 Pac. 265; *State v. Cloud County Comm'rs,* 148 Kan. 626, 84 P. 2d 405.) And in some of the above cases, as well as in *Drainage District v. Wyandotte County et al.,* 117 Kan. 369, 232 Pac. 266, it was held that no writ should issue in doubtful cases or to enforce a right which is in substantial dispute.

In *Sharpless v. Buckles,* 65 Kan. 838, 70 Pac. 886, it was held:

"The only purpose of a writ of mandamus is to require the person to whom it is issued to perform some act which the law enjoins as a duty. The writ itself confers no power and creates no duty, and its only office is to command the exercise of a power already possessed, or the performance of a duty already imposed.

"The duty of a county canvassing board is ministerial only. If the election returns made to the county clerk are genuine and regular, the board has no other duty to perform than to make the footings and declare the result. Mandamus will not lie to require a county canvassing board to recanvass returns and exclude from the count certain votes because cast and returned under a law that is claimed to be unconstitutional, since the determination of such question is not a duty imposed on the board, nor within its power." (Syl. ¶¶ 1, 2.)

A similar situation to that considered in the above case was considered in *Lemons v. Noller,* 144 Kan. 813, 63 P. 2d 177, where absentee ballots had been counted and an application for a writ to prevent was entertained, but where in the second paragraph of the opinion it was stated that our action in so doing was not to be considered as a precedent that proceedings in mandamus may be substituted for a proceeding to contest an election or other proper remedy. In the present case, we do not choose to deny the writ upon the technical ground that some other remedy may be available. The question presented requires an answer for the guidance of public officials, and possibly would be difficult to raise if a different remedy were pursued.

It appears that under our statute pertaining to mandamus, and under our decisions treating the statutes and the general right to the writ, that before the writ may issue, it must appear the plaintiff

has a clear right to compel the performance of an act which it is the lawful duty of the officer or board sought to be coerced to perform, and so we proceed to an examination of our statutes pertaining primarily to the right of electors absent from the state to vote, with especial attention to their qualification, manner of voting, return of ballot, counting of votes, and to such provisions of the general election laws as may be applicable, to determine what the right of a candidate for a state office may be to inspect the affidavit returned with the ballot.

As a preliminary to an intelligent discussion, it is necessary that a review be made of the particular statute with reference to the right of electors absent from the state to vote at a general election, the same being G. S. 1935, chapter 25, article 11. Except as otherwise necessary, we shall refer only to such ballots as are cast for state officers and returned to the secretary of state, but otherwise the summary is quite complete. As all statutory references hereafter made refer solely to chapter 25 of the General Statutes of 1935, to avoid repetition we shall refer only to the section number.

Under section 1101, a qualified elector who is to be absent from the state upon the day of a general election and who is actually so absent may, upon having complied with the law in regard to registration if applicable to him, vote for state officers. The concluding sentence of the section reads: "The votes of such electors shall be cast and received and canvassed as in this act provided."

Section 1102 refers to the county clerk's duties in the preparation of ballots for county offices. Section 1103 makes it the duty of the secretary of state to procure ballots for state officers, and that attached to each ballot shall be a stub with a perforated line allowing it to be easily torn from the ballot. The ballots shall be consecutively numbered and the stubs shall contain the same numbers as the ballot. The stub shall contain a printed form of affidavit, to enable the voter to state his place of residence, election precinct and place of residence therein, whether he is duly registered and that he personally marked the ballot to which the stub was attached and personally removed the stub after marking the ballot. It is here noted that it is these particular affidavits which are to be removed from the ballots which plaintiff desires to inspect and examine. We shall hereafter refer to them as identifying affidavits to distinguish them from another and different affidavit required by the following section. Section 1104 requires that in a specified time preceding an

election, any person described in section 1101 may file with the county clerk of the county of which he is a resident an affidavit in duplicate duly executed. We shall hereafter refer to these affidavits as the qualifying affidavits. These qualifying affidavits shall state the precinct in which the elector is a resident and his correct post office address, and that he will necessarily be absent on election day. The statute then reads:

"It shall be the duty of the county clerk at once upon receiving such affidavit to ascertain and determine whether or not the person named therein is a duly qualified elector of such county, and to enter upon a record kept by him such name, and thereupon he shall mail to the secretary of state one copy of each such affidavit and file the other in his office, and certify to the secretary of state the name of such person named therein to be a duly qualified elector of his county." (25-1104.)

Under section 1105 it is the duty of the secretary of state, upon receiving the certificate from the county clerk with a copy of the qualifying affidavit, to forward to the voter named in the certificate one of the state ballots with stub attached and with printed instructions and an identification envelope having the same number outside as the number of the ballot and stub which he sends the voter. Section 1106 provides that the voter, upon receipt of the ballot, may cast his vote by placing his cross mark with ink or black pencil opposite the name of each person for whom he wishes to vote and that he shall make no other mark and allow no other person to make any marks on the ballot, and he shall then fill out the identifying affidavit upon the stub, execute it in the manner provided, and shall then personally remove that affidavit and place it in the identification envelope bearing the same number as his ballot and stub (affidavit), seal the identification envelope and enclose the same with his ballot in an envelope duly sealed, addressed to the secretary of state. The statute states: "Such ballot shall be marked and mailed on such election day," etc.

Section 1107 requires the secretary of state to keep a record of the ballots sent out by him. Section 1108 pertains to the place of residence for registration purposes and is not presently involved. Section 1109 provides for canvass of all state ballots by the state board of canvassers at a time fixed and "No ballot shall be counted unless marked and transmitted as required by this act."

Section 1110 provides that if any person make or cause to be made and delivered a false affidavit to be used under the act, etc., upon conviction he shall be punished by fine not exceeding $1,000 or by

imprisonment not to exceed one year or by both fine and imprisonment. Section 1111 makes it unlawful for a voter to vote more than once. Section 1112 provides that if more than one affidavit giving different addresses of the same voter be filed with the county clerk, it shall be his duty to determine the correct address. Section 1113 states that the provisions of the general election law which are in their nature applicable shall apply to all transactions under this act.

It will be observed the above statute contains no provision whatever for the challenge of any voter, but that it does specifically provide the votes "shall be cast and received and canvassed as in this act provided." There is no allegation in the motion for the writ that this provision of statute was not literally followed. In plaintiffs' oral argument and brief that provision is ignored, his contention being that under the general election laws he is entitled to challenge each person offering to vote and that he can only do so by inspecting and examining his identifying affidavit.

Article 5, section 1, of our state constitution fixes the qualifications of electors; section 2 provides who are disqualified; section 3 makes provision as to gaining or losing a residence, etc., while section 4 states:

"The legislature shall pass such laws as may be necessary for ascertaining by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established."

Under authority there granted, acts for registration of voters in certain instances have been passed. The general election laws also provide that any person desiring to vote shall give certain information to the judges of election, and for the challenge of the right of such person to vote, by any person (sec. 415) or by one of the judges of election (sec. 408), and machinery is provided for determining his right (sec. 408, *et seq.*), and if a challenged person's vote be received, appropriate reference is made on the poll book and his ballot is numbered (sec. 413). These provisions were enacted long prior to the absentee voters' act under consideration. They contemplate a challenge at the time the person offers to vote and not at some subsequent time and not when the vote is being counted. At the time the count is made, all ballots are counted whether of challenged voters or not, and the only usual purpose of the challenge and the numbering of the ballot is for the purposes of identification in the event of a contest.

The act now under consideration was passed at a much later date

and, as noted, contains a provision that the votes shall be cast, received and counted as *provided in it*. Under section 1106 the vote is cast when the ballot is marked, the identifying affidavit executed and removed, and the two placed in envelopes and mailed on election day. The sections of the general election law applicable to challenge refer to challenge before the vote is cast. They are obviously inapplicable to out-of-state absentee voters, and in conflict with the provisions of the act under consideration. It is true there are provisions for representatives of a candidate to be present during the time of receiving and counting votes at the polling places (sec. 421) and to permit them to inspect ballots when the vote is counted (sec. 419), but neither of these sections gives any right to challenge. There is no provision of any kind permitting a challenge of a voter after his vote is cast.

Under the specific act, any person desiring to vote as an absentee is required by section 1104 to file the duplicate qualifying affidavits, and it is specifically made the duty of the county clerk to determine qualification and to certify that fact to the secretary of state. Lacking that certificate, no ballot and identifying affidavit would be sent to the proposed voter. No reason has been advanced why this portion of the statute is not a valid exercise of the power conferred by the constitution. And it may here be observed that, so far as the statute is concerned, if a challenge were at any time proper, it might just as well be filed with the county clerk on or before election day and lodged against the qualifying affidavit made when the proposed voter initiates his right to vote, as to his identification affidavit the only purpose of which is to show he is the same person as the one who was certified by the county clerk to the secretary of state as a qualified elector and which identifying affidavit is not made until after he has marked his ballot. The statute, however, contains no provision for challenge in either instance.

The defendant board contends that to display the identifying affidavits would violate the secrecy of the ballot with consequent results. The plaintiff contends that under our decision in *Lemons v. Noller,* supra, we held that an absentee voter waived his right of secrecy, and to sustain that contention, he directs attention to one or two sentences which he reads separate and apart from the context of the opinion. In that case, the constitutionality of the statute here involved was under consideration, it being contended the act was bad because secrecy of the ballot was not preserved. We need not

review what was said there. All that was under consideration was right of secrecy as against the canvassing board of the county, not as against candidates or the public generally. By way of parallel, see section 417, providing that clerks and judges of election shall give no information as to how the ballot of a person requiring physical assistance was marked. If it be assumed the defendant board in opening the envelopes returned to the secretary of state, performed duties comparable to those performed by an election board in receiving and counting votes, it would follow that provisions of the general law as to the conduct of its members would be applicable, and if they made disclosure, they would be subject to the provisions of section 1720, reciting:

"Any public officer . . . who shall disclose to anyone except as may be ordered by any court of justice, the contents of any ballot as to the manner in which the same may have been voted, shall upon conviction be punished by a fine of not less than fifty dollars nor more than one thousand dollars, or by imprisonment in the penitentiary for not less than one year nor more than five years, or by both such fine and imprisonment."

It is to be remembered that the identifying affidavit and the ballot bore the same number—there is no provision for eliminating the number, and if plaintiff may examine the identifying affidavit and inspect the ballot, he will know how each absentee voter cast his ballot for any particular office. Certainly he has no such right in the absence of a clear statutory declaration to that effect.

Further, if the general election laws are to be considered as applying, we note that the statute pertaining to absentee voters within the state, passed prior to the statute under consideration, expressly provides for return of the ballot in an envelope, the face of which discloses the voter's name, and that when the board of county commissioners shall open the envelope and ballot, they are required to—

"Keep the fact of such vote and the person for whom the same is recorded and the contents thereof secret and shall not reveal or divulge the same." (Sec. 1005.)

And further that any candidate or his authorized representative may be present at the canvass, but neither shall be permitted to see the notations on the envelopes in which the ballots were returned from other counties. (Sec. 1008.) If the above section is in any manner applicable, or if any analogy may be drawn as to state policy with respect to secrecy, it is that the candidate may not know how any absentee voter cast his vote. Failure of the election offi-

cials to observe the above requirements would subject them to the penalties of section 1720, quoted above.

Another matter persuasive to us is this: The statute under consideration expressly provides that only upon certification of qualification by the county clerk is the secretary of state to send out any ballots, and it provides explicitly the manner in which the voter shall cast his vote and return his ballot, and that "no ballot shall be counted unless marked and transmitted as required by this act." (Sec. 1109.)

There is no allegation in the motion for the writ charging that this section was not literally observed, no allegation that any ballot was sent to or voted by an unqualified elector, nor is it charged there was any fraud or corruption or dereliction of any kind, either by a voter, a county clerk, the secretary of state or the defendant board, and this court may not assume the public officials did not perform fully the duties incumbent upon them under the act.

Election laws are liberally construed to permit exercise of the right of suffrage conferred by the constitution and laws of the state. To protect that right it is equally as important to preserve the voter's right to cast his vote freely and as secretly as circumstances under which he votes may permit, as it is that some other person has a right to protest that he is not a qualified elector. If he is unlawfully deprived of his right to vote, or, if having voted, his right of secrecy be invaded, he may do nothing further than invoke the criminal laws. The protestor, however, is not limited to his right to challenge. He may forego that entirely, but in an election contest case may have reviewed fully whether any person who voted for the particular office in controversy was a qualified elector. (See sec. 1426 and *Hansen v. Lindley,* 152 Kan. 63, 102 P. 2d 1058.) In the opinion in the case last mentioned, as reported in our advance sheets, the statute is quoted with reference to the duty of judges of election in determining residence (sec. 407), and it is stated the section refers to the judges of election when a vote is challenged and intended as a guide for them. Then follows this statement: ·

"*The first opportunity a candidate has to challenge a mailed-in vote, however, is when the board of canvassers is considering it.* Hence there is no reason why the above section should not be a guide *to the board of canvassers,* to the contest court, and on appeal to the district court and to this court." (Italics ours.) (p. 68.)

The action considered in that case was an election contest proceeding. The statement above quoted was made *arguendo.* It was

foreign to the issue tendered, in the nature of *dictum*, and is not any part of the law of the case as stated in the syllabus. As a statement of law, it is not correct and is disapproved. It has been eliminated from the opinion and that portion printed in italics will not appear in the permanent bound volume of our reports.

It is to be borne in mind the present proceeding is not an election contest where ballots and affidavits may be introduced in evidence for the purpose of determining their sufficiency. (See *Hansen v. Lindley,* supra.) The present proceeding is one in which no relief of any kind is sought further than to ask this court to compel permission for an examination to determine sufficiency. In effect, plaintiff is seeking to learn how each absentee ballot was cast, before he determines to file a contest. In the absence of some statute so authorizing, and there is none, that may not be done.

The matters raised by the interventions and presented in the briefs of the interveners are sufficiently discussed in what has been said.

We conclude the motion for the writ of mandamus should be denied, and it is so ordered.

WEDELL, J. (concurring): I concur in the conclusion of the majority. I disagree entirely with petitioner and the minority opinion that no secrecy of the ballot was intended for the absentee voter. This court has never so held and, if it should so hold, I would definitely dissent.

It is common knowledge that Democrats and Republicans alike, consistently have been solemnly assured they possessed the right of secrecy in their ballot. It is common knowledge the voter has been informed again and again by Republicans when they desired Democratic votes and by Democrats when they sought Republican votes, that his ballot was secret. These absentee voters who have intervened and appeared in this case to assert their right to have the secrecy of their ballot protected will receive that protection at my hands, irrespective of their political faith, to the extent I can legally protect that right.

Strange as it may seem, the solemn promise, assurance and pledge of secrecy suddenly appears to have been completely forgotten by the petitioner and also by some others. It also appears it has been completely forgotten that such assurance to the voter was based upon the law of this state. Candidates and their representatives may suddenly and conveniently forget or ignore those laws,

but courts are not permitted to do so. I refuse to deliberately set myself to the task of discovering some apparently plausible excuse or pretext whereby the true purpose and intent of the lawmakers may be evaded and the secrecy of the absentee ballot completely destroyed. I refuse by mandamus, or otherwise, to compel election officials to do that which the lawmakers have seen fit to designate as a crime and have made punishable by fine or imprisonment in the state penitentiary, or both.

Now, how does the petitioner propose to answer the penal provision of our law designed to safeguard the secrecy of the ballot? Curious as it may seem, he makes no attempt to meet that clear expression of the legislative will. The provision and its intent is too clear to admit of argument. Instead of attempting to meet it frankly the provision is completely ignored. This court, however, is not permitted to ignore the plain intent and purpose of the lawmakers. On the contrary, courts are required to give expression to and to make effective the legislative will.

What would have happened to the secrecy of the ballot in the instant case had petitioner or his representatives been permitted to examine the affidavits in question? I refuse to discuss a purely abstract question. The issue now before us is whether secrecy would have been violated, *in the instant case,* if petitioner's request for inspection of the affidavits had been allowed at the time it was made and in the circumstances under which it was made. Petitioner's contention that permission to examine the affidavits would not have destroyed the secrecy of the ballot, is simply idle talk and worthy of little, if any, serious consideration. Before pursuing that subject further, however, it is well to note if petitioner's contention that the law does not provide for any secrecy in case of absentee ballots be correct, then obviously there would be no need of petitioner's insistence that an examination of the affidavits would not have destroyed the secrecy of the ballot. A mere statement of essential facts, however, is itself proof conclusive that the granting of permission to petitioner or his representatives to examine the affidavits as well as the ballots would have destroyed completely all secrecy of the absentee ballots and would have constituted a plain violation of the penal provisions of our law. It is not contended, in the instant case, petitioner's representatives had not been permitted to examine the *ballots* or that they were not in fact examining the *ballots* at the time they requested permission to examine the affidavits. In any event there

does not appear to be any question concerning the fact that petitioner's representatives were permitted to examine the ballots. Incidentally, I may also say that since our decision was announced in the instant case petitioner has filed a second original proceeding in mandamus in this court touching the same election and the state canvassing board, in which he sets forth the *ballots* by number which he claims were illegally counted for reasons other than those pertaining to the affidavits. (Case No. 35,124.) Since petitioner does not contend, in the instant case, that his representatives were not permitted to examine the ballots or that they did not in fact examine them, it may of course be assumed in the instant case without reference to the averments contained in the second proceeding in mandamus, that the ballots were examined by petitioner's representatives.

The ballots bore the same number as the identifying affidavits. The affidavits, of course, contained the name of the voter. Had petitioner's representatives been permitted to examine also the affidavits, then manifestly the manner in which each elector had cast his vote could no longer have been a secret. These are the plain facts upon which this court is asked to compel the canvassing board to do that which the law says it shall not do, namely, disclose how the elector cast his vote. It should not be forgotten the petitioner did not seek an order of this court directing the canvassing board to first clip the number from the affidavits (or ballots), and then permit examination of the affidavits. What petitioner did ask this court to do was to compel the canvassing board to permit him or his representatives to examine the affidavits transmitted to the secretary of state. It is obvious it was not preservation of the secrecy of the ballot with which petitioner was concerned. If it was only the right of challenge with which petitioner was actually concerned the affidavits might have been challenged, if such right of challenge then existed, as well without the number being retained upon the affidavits (or ballots), as with it. Irrespective, however, of what the motive for permission to inspect the affidavits may have been, the result would have been exactly the same, namely, the complete destruction of the secrecy of the ballot.

I know of no individual or group of individuals who hold a monopoly upon the sincere desire for fair and honest elections. That such elections must be preserved and maintained is readily conceded and, of course, is the deep conviction and ardent desire of every good

citizen. The decision of the majority in nowise infringes upon the right of petitioner to contest the instant election in the manner provided by law if grounds for contest exist. The decision of the majority, however, preserves the secrecy of the absentee ballot as far as the law permits it to be preserved. I find myself wholly unable to agree with the contention of the petitioner and the minority view that permission to examine the affidavits as transmitted to the secretary of state would not have destroyed the secrecy of the ballots in question. The affidavits, of course, remain subject to proper challenge in a contest action with the result that petitioner has suffered the loss of no substantial right necessary to the preservation of free and honest elections. The writ which the petitioner seeks, however, cannot issue in a mandamus proceeding.

There are other phases of this proceeding which might be discussed, but in view of the thorough and exhaustive manner in which they have been treated in the majority opinion, I deem it entirely unnecessary to dwell upon them further.

ALLEN, J. (dissenting):

1. *Right of Secrecy.*

In *State, ex rel., v. Beggs,* 126 Kan. 811, 271 Pac. 400, it was held as stated in the syllabus:

"Whatever secrecy may be guaranteed a voter by the constitution in that the voting shall be by ballot (art. 4, sec. 1) is as to the vote actually cast by him, and does not apply to or include his prior political leaning or party affiliation nor the inference that may be drawn from his expressed party affiliation." (Syl. ¶ 3.)

I agree with the evident view of the majority in that case that the constitution requires secrecy of the ballot. Secrecy is implied from the express provisions in the constitution.

In *Lemons v. Noller,* 144 Kan. 813, 63 P. 2d 177, as I construe the decision, it was held that even though it be conceded that election by ballot means a secret ballot, yet the out-of-state voter, by the very act of voting, waived the right of secrecy. I think it is a fair conclusion that the waiver was out and out. I find no limitations, express or implied, in the opinion.

In the Lemons case the constitutionality of the absentee ballot statute was challenged on the ground it did not preserve the secrecy of the ballot. It was held as stated in the syllabus:

"Such right of secrecy as may be granted or preserved under article 4, section 1, reading: 'All elections by the people shall be by ballot,' is a right per-

sonal to the elector and may be waived by him where such waiver is not prohibited by statutory enactment." (Syl. ¶ 5.)

In the opinion it was said:

"It is also argued that the statutes under consideration cannot be upheld because they do not preserve the secrecy of the ballot. It should be observed that the requirement of article 4, section 1, of our constitution is that 'all elections by the people shall be by ballot,' and *not by secret ballot,* and the matter of secrecy is one for legislative determination. The securing of secrecy in voting has been the result of gradual growth in the statutes, even though it be conceded that an election by ballot means a secret ballot.... In the act permitting absentee voting within the state, it is provided that 'the board of county commissioners and the county clerk of each county wherein any vote of any absent voter is received as herein provided shall keep the fact of such vote and the person for whom the same is recorded and contents thereof secret and shall not reveal or divulge the same.' (R. S. 25-1005.)

"In the act permitting absentee voting without the state, there is no provision with respect to secrecy.

"From the above it is clear that the terms 'secrecy' and 'absolute secrecy,' as applied to voting, must be considered not alone as being included in the constitutional provision for voting by ballot, but in view of statutory provisions subsequently enacted. It would seem the first election laws went no further than to secure to the voter a right of secrecy—it was not until the enactment of the Australian ballot law that extensive measures were taken to prevent the voter from voting openly as distinguished from secretly or that tended to prevent his waiving his right to secrecy.... If it be said that the constitutional provision of vote by ballot means a secret ballot, does that mean that any ballot not cast in absolute secrecy is void? If so, what of our statutes with reference to preserving identity of challenged votes? And what of our statutes with reference to the physically disabled voter? And of what effect is article 5, section 4, conferring on the legislature the right to pass laws for ascertaining by proper proofs the citizens who shall be entitled to the right of suffrage? Or is it a more rational conclusion to say that the secrecy is a right granted to the citizen, which, like many other rights, may be waived? If the latter be true, then it was within the legislative power to provide that certain classes of voters, by the mere act of voting, could waive their right of secrecy. We are aware that courts of other states have arrived at contrary conclusions, but at least in some cases it is because of constitutional provisions. . . . We are of opinion that the constitutional right of a voter to cast his vote in secrecy is a right which, where he is not prevented therefrom by positive statutory enactment, he may waive, and that provisions of statutes for absentee voting by certain classes of voters may not be stricken down as unconstitutional if, by fair interpretation, it may be said the voter, in casting his ballot under them, has waived his right of secrecy. So considered, the provisions of our absentee-voters laws are not unconstitutional." (pp. 828, 830, 832.)

The court directs attention to the provision preserving secrecy of the ballot as to the absentee voter within the state, and then states

that: "In the act permitting voting without the state, there is no provision with respect to secrecy." The opinion then declares that it is within the legislative power to provide that certain classes of voters "by the mere act of voting, could waive their right of secrecy." Why was the act not declared unconstitutional? The answer is found in the last paragraph of the opinion above quoted—that the statutes for absentee voting by certain classes of voters *"may not be stricken down as unconstitutional if, by fair interpretation, it may be said the voter, in casting his ballot under them, has waived his right of secrecy. So considered,* the provisions of our absentee voters' laws are not unconstitutional." (Italics inserted.)

I submit that this is a clear and plain declaration that the out-of-state voter by the very act of voting waived his right of secrecy.

That freedom of ballot is just as essential to the perpetuity of our institutions as freedom of speech, freedom of the press and freedom of religion, few will deny.

Secrecy of the ballot must be kept inviolate—otherwise, the elector will not express his choice between candidates; otherwise, personal, political and economic pressure will corrupt the election.

In the present case it is held, as stated in the syllabus:

"The affidavit form attached to the ballot when sent out by the secretary of state, and executed, detached and placed in the identification envelope, and returned with the ballot to the secretary of state, is for the purpose of identifying the voter as being the same person who was certified by the county clerk to the secretary of state and is not for the purpose of showing the voter's qualifications otherwise." (Syl. ¶ 4.)

It seems fair, then, to state that in the Beggs case a majority of this court held the opinion that secrecy of the ballot was protected by the constitution; that in the Lemons case we held secrecy was not within the shield of the constitution, but that by the exercise of the right to vote, the out-of-state voter waived the right of secrecy, and that in the present case the court has determined the waiver is only partial and not absolute.

With deference I think the absentee ballot statute violates the letter and spirit of the constitution, and that we should at this time so declare.

2. *The Privilege to Challenge.*

Secrecy of the ballot only applies to those persons qualified to vote. The disqualified have no such claim.

To protect the ballot and to insure honest elections there must be an opportunity to challenge the unqualified voter.

The constitution of the state of Kansas specifies the qualification of voters:

"Every citizen of the United States of the age of twenty-one years and upwards—who shall have resided in Kansas six months next preceding any election, and in the township or ward in which he or she offers to vote, at least thirty days next preceding such election—shall be deemed a qualified elector." (Art. 5, sec. 1.)

## Our statute, G. S. 1935, 25-407, provides:

"The judges of election, in determining the residence of a person offering to vote, shall be governed by the following rules, so far as they may be applicable:

"*First.* That place shall be considered and held to be the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning.

"*Second.* A person shall not be considered or held to have lost his residence who shall leave his home and go into another state or territory, or county of this state, for temporary purposes merely, with an intention of returning.

"*Third.* A person shall not be considered or held to have gained a residence in any county of this state, into which he shall have come for temporary purposes merely, without the intention of making said county his home, but with the intention of leaving the same when he shall have accomplished the business that brought him into it.

"*Fourth.* If a person remove to any other state, or to any of the territories, with the intention of making it his permanent residence, he shall be considered and held to have lost his residence in this state.

"*Fifth.* The place where a married man's family resides shall be considered and held to be his residence.

"*Sixth.* If a person shall go into another state or territory, and while there exercise the right of suffrage, he shall be considered and held to have lost his residence in this state."

This statute was passed in 1868. For more than seventy years it has stood as the legislative standard by which to determine and protect the qualified voter, and to detect and exclude those not qualified. If this court lays down a rule whereby it becomes impossible to determine the fact of residence of the proposed voter, what becomes of this statute and the above provision of the constitution? If the privilege of challenge is gone, is there any virtue in the constitutional provision which specifies the residential qualification of the voter, or in the statute which declares who is, and who is not a resident?

Such is the grave question with which we are confronted.

The question here presented is whether a candidate or his authorized representative has the right to examine the identifying affidavit

accompanying the ballot for the purpose of challenging the qualification of the person offering to vote.

The facts are not in dispute. The secretary of state on application mailed to persons claiming to be electors of Kansas ballots and identifying affidavits, and about 7,000 of these ballots and affidavits have been returned to his office. The canvassing board has convened and opened the envelopes, examined the identification affidavits and segregated them from the ballots. The plaintiff, through his authorized representatives, has demanded the right to inspect these affidavits for the purpose of determining whether the voter is a qualified elector of the state. The canvassing board has refused to permit such examination, and the plaintiff has brought this action asking the court to issue a writ directing the board to permit such examination under reasonable rules and regulations.

To answer the question here presented it is necessary to read the general election laws in connection with the absentee-voter statute.

In our statute, G. S. 1935, 25-1113, it is provided that the provisions of the general election laws of this state which are in their nature applicable, shall apply to all transactions under this act.

The general election laws provide that when a voter presents himself at the voting place, that any member of the board or any elector shall have the right to challenge the qualification of such voter to cast his ballot (§ 25-408), and that upon such challenge the judges of the election, under certain procedure, shall determine his right to vote. (§ 25-411.) The statute also provides that the candidates, or their friends, may be present during the time of receiving and counting of the votes. (§ 25-421.) This is regarded as a sacred right and the court in commenting on this right guaranteed by the statute, in *State, ex rel., v. Malo,* 42 Kan. 54, 22 Pac. 349, said:

"The refusal of an election board, composed exclusively of the partisans of one town, in a county-seat election, to permit representatives of the opposing town to be present in the polling room during the reception of the vote, is evidence of a corrupt and dishonest purpose in the conduct and result of the election." (Syl. ¶ 1.)

In the opinion the court said:

"It seems clearly established, also, that the refusal of the Cimarron people to allow Ingalls, and the candidates for county offices on the Ingalls ticket, to have representative friends in the polling rooms of Foote and Cimarron precincts, was because they intended to conduct the election in these townships in a corrupt and fraudulent manner. They denied to all those inter-

ested in Ingalls, and to all others who thought that for any reason the permanent county seat of Gray county ought to be located in that town, and to all those persons who were candidates for office on what was known as the 'Ingalls ticket,' a right clearly given them by the statutes of this state. We consider this denial as a strong circumstance clearly indicating a fraudulent intent on the part of the Cimarron managers to dishonestly and corruptly conduct the election. And if there were no other facts pointing in the same direction, and this fact stood alone, we should require a strong showing to relieve it of that irresistible inference of bad faith and dishonest conduct that is inseparable from a refusal to let all see what was going on in the polling room. If an honest election was intended, the adverse party would be invited to inspect every act. It is an unmistakable badge of fraud, and stamps every election board that refuses inspection, with a flagrant violation of the law at the threshold of its duty, and I believe ought of itself to be sufficient to cause the rejection of the returns of any township whose board of election pays no regard to the mandates of a law framed and passed for the express purpose of preventing and exposing dishonest practices at an election." (p. 61.)

This case has been consistently followed in this court. (*State, ex rel., v. Comm'rs of Kearny Co.*, 42 Kan. 739, 749, 22 Pac. 735; *State, ex rel., v. Fulton*, 42 Kan. 164, 22 Pac. 378.)

It has always been a fundamental principle of the election laws of this state that voting, receiving and counting ballots and all incidents in connection therewith shall be public and that the candidate, or any elector, shall have the right to challenge the qualification of any person presenting himself to vote or the correctness of the counting of any ballot. Under the Lemons case the elector has the right only to secrecy in the marking of his ballot and, as shown above, this is a right that he may waive.

In other words, underlying the principle of free elections is the right of the candidate or any elector to challenge the qualification of another to vote and the burden is on the person offering to vote to meet the constitution and statute. When the question of the right to vote arises upon a challenge duly made, secrecy vanishes, and the least that the board can do when challenge is made is to identify the ballot and permit the elector to vote. (§ 25-413.)

With these fundamental principles in mind, the absentee statute must be examined.

The legislature conferred upon the qualified electors of the state who are actually absent from the state on election day the right to vote under certain well-defined procedure. (§ 25-1101.) If such elector finds that he will be actually absent from the state on election day he must, between and including thirty days and two days

preceding such election, make an application to the county clerk of the county in which he is an elector for a ballot to be mailed to him at the post-office address at which he expects to be on election day. Such application shall be in the form of an affidavit and shall state the precinct in which such person is an elector, his correct post-office address and that he will be necessarily absent from the state on election day. Upon the receipt of such application it is the duty of the county clerk to determine whether such person is a qualified elector of such county and entitled to receive the ballot. If he finds that the applicant is entitled to receive the ballot he certifies that fact to the secretary of state and the secretary of state is authorized to mail to such elector, at the address given, a ballot, together with an identification affidavit. (§ 25-1104.)

The city clerk follows the same procedure in certifying to the election boards the registration record. (§ 12-913.) This, however, is not conclusive.

Our statute, G. S. 1935, 12-909, provides:

"No person shall be entitled to vote at any election in any such city who is not registered according to the provisions of this act. The registration shall not be conclusive evidence of the right of any registered person to vote, but said person may be challenged and required to establish his right at the polls in the manner now required by law."

Upon the receipt of the ballot and identification affidavit attached thereto in the form of a stub, the elector shall on election day prepare his ballot and affidavit in accordance with the following procedure:

(a) He shall place his cross mark with ink or black pencil in the square opposite the name of each person for whom he desires to vote. He shall make no other mark and shall allow no other person to make any mark upon such ballot. (§ 25-1106.)

(b) He shall then fill out in full the affidavit upon the stub attached to such ballot, sign the same in the presence of an officer authorized by the laws of Kansas or of the United States to administer oaths and swear to the same in the presence of such officer, who shall attach thereto his certificate in due form as required by law. (§ 25-1106.)

(c) The affidavit attached to the ballot, as aforesaid, shall state clearly the place of his residence, including the election precinct and place of residence therein, and whether or not he has been duly registered, his post-office address at the time of the election, and that he personally has marked the ballot to which the stub was

attached, and personally removed the stub after marking such ballot, and that no other person has placed any mark on such ballot. (§ 25-1102.)

(*d*) The voter shall then personally remove said stub from said ballot and place the same in the identification envelope bearing the same number as the ballot and stub and seal said identification envelope and enclose the same, together with the ballot, in an envelope duly sealed, addressed to the secretary of state. (§ 25-1106.)

(*e*) Such ballot shall be marked and mailed on election day and shall reach the secretary of state on or before ten days following such election. (§ 25-1106.)

All ballots transmitted to the secretary of state under the provisions of the act shall be canvassed by the state board of canvassers at their first regular session following such general election. "No ballot shall be counted unless marked and transmitted as required by this act." (§ 25-1109.) This is mandatory. The board has no discretion. (*Hooper v. McNaughton,* 113 Kan. 405, 214 Pac. 613.)

It will be observed that there is no provision in this statute for the secrecy of the ballot and this court so stated in the Lemons case, *supra,* where it said:

"In the act permitting absentee voting without the state, there is no provision with respect to secrecy." (p. 830.)

The only suggestion of secrecy in the statute is the requirement that the identification affidavit shall be put in a separate envelope. This implies that when the canvassing board canvasses the ballot they shall first examine the identification affidavit. This affidavit is the constructive appearance of the elector offering to cast his ballot. From this affidavit the canvassing board must determine whether the person making the same is a qualified elector. It stands in the same position as does the person when he presents himself to the election board in his precinct.

In *Lemons v. Noller,* supra, the court had before it the question of the constitutional requirement that the elector vote in the township or ward in which he resides, and said:

"That it was within its constitutional power for the legislature to provide that an offer to vote in the township or ward in which the elector resides, could be made by subscribing to the affidavit prescribed in the statutes." (p. 827.)

Under these circumstances, the identification affidavit being a constructive appearance of the voter, *the general election laws must*

*necessarily apply and any elector, candidate or friend of the candidate has the right to examine the affidavit and challenge the right of the person making the affidavit to vote. If the affidavit should show that the elector has ceased to be a resident of the state of Kansas or the ward or precinct in which he is registered, then in that case he has no greater right to vote than if he appeared in person in such ward or precinct, and it is the duty of the board to reject his ballot.* This procedure in no sense disturbs the secrecy of the ballot. The objector bases his objection upon the affidavit or such other information as he may have and in making such challenge he does not know for what persons the ballot is cast. His objection goes to the qualification of the person appearing constructively to vote.

The facts in this case are undisputed. The affidavits which plaintiff desires to examine have been and are segregated from the ballots. An examination of those affidavits will in no manner violate the secrecy of the ballot, if under the Lemons case it can be said that an absentee out-state ballot is a secret ballot. If, upon examination of an affidavit, objection is made to the qualifications of an elector, that objection will necessarily be made without knowledge of what the ballot discloses.

It would seem that the constitutionality of the absentee-voter law in this state was decided by this court in the Lemons case on the theory that the affidavit which accompanies the absentee ballot was the constructive appearance of that voter in the voting precinct and before the election officials. A candidate or his representative certainly has the legal right to challenge the qualifications of an elector when he thus appears, whether such appearance be actual or constructive.

This question was before this court in our recent case of *Hansen v. Lindley,* 152 Kan. 63, 102 P. 2d 1058. In the syllabus of that case it was stated:

"In an election contest the contestor contended that the ballots of certain voters who were outside of the state on election day, voted outside the state and mailed their ballots to the county clerk, should not be counted on account of certain defects appearing on the face of the accompanying affidavits. The ballots and accompanying affidavits were introduced in evidence before the trial court and are before us. They are examined, and it is held that where the irregularities were mere clerical errors or formal mistakes they were not sufficient to render the ballots invalid." (Syl. ¶ 2.)

In the opinion it was said:

"The objection of Hansen to the group of ballots we are now considering is that the persons who cast them were not actually residents of the state, hence could not be qualified electors of the state. The qualifications for electors are fixed by article 5 of the state constitution." (p. 67.)

After quoting section 1, article 5 of the constitution, also section 25-407 (hereinabove quoted), the opinion then stated:

"The above section refers to the judges of election when a vote is challenged and was intended as a guide for them. *The first opportunity a candidate has to challenge a mailed-in vote, however, is when the board of canvassers is considering it. Hence, there is no reason why the above section should not be a guide to the board of canvassers, to the contest court, and on appeal to the district court and to this court.* After all these provisions are examined, it becomes clear that the question of whether a particular person is resident so as to make him a qualified elector is one of fact. It was so treated in this case. As has been pointed out heretofore, the trial court heard evidence on this question as to each of the ballots about which this argument is made. The court found in effect that the persons who cast these ballots were residents of the precincts of which they claimed to be residents. We have examined the record, including the transcript, and have concluded that the above finding of fact was proved by substantial, competent evidence in regard to each ballot about which the question is raised." (Italics inserted.) (p. 68.)

In the majority opinion in the present case, it is stated that the affidavit is "for the purpose of identifying the voter as being the same person who was certified by the county clerk."

But identification is not the test of the right to vote. Under the constitution the qualified voter must have lived in the state six months and in the township or ward at least thirty days next preceding the election. Identification is important in determining the question of residence, but does not qualify the person identified to vote. The candidates for governor may be known to every election judge and voter in the state, but can vote only at their place of residence. It would seem, therefore, that if the only office or function of the affidavit is to identify the voter, the requirement of the affidavit is void of meaning.

It is submitted that under this ruling the privilege to challenge the unqualified voter ceases to exist. American democracy has developed under a two-party system. When at an election the watchful eye of the opposite party is averted either by force, by fraud or by rule of law, freedom of election is destroyed.

I think the writ should be allowed.