THE STATE, ex rel. JAMES GRIFFITH, et al., v. OSAWKEE TOWNSHIP, et al.

MUNICIPAL BONDS, not Issued for Public Purposes; Constitutional Law. The act of the legislature of 1875, entitled "An act authorizing townships to issue bonds for relief purposes," in that it provides for the issue of bonds and the levy of taxes for other than public purposes, is unconstitutional and void.

*Error from Jefferson District Court.*

CHAPTER 42, Laws of 1875, entitled "An act authorizing townships to issue bonds for relief purposes," was passed and approved February 20th, and was published February 23d. On the 8th of March the electors of the township of Osawkee, Jefferson county, at an election called and held for that purpose, voted for the issuance of "relief bonds" to the amount of $6,000, to be issued under said act of 20th February. On the 11th of March *James Griffith* and *William Armistead*, resident citizens and taxpayers in said Osawkee township, as relators, commenced an action in the district court in the name of *The State of Kansas*, as plaintiff, against said *Osawkee Township*, and against the trustee, clerk and treasurer of said township, as defendants, to restrain and perpetually enjoin the defendants from executing, signing, issuing or selling said "relief bonds" so as aforesaid voted to be issued, or any of them. A temporary injunction was granted. The defendants appeared and moved to dissolve said temporary injunction, and said motion to dissolve was heard before the district judge, at chambers, on the 22d of March. It was admitted on the hearing that the election was duly and legally held, that all acts and proceedings of the township board were regular, and that there was a majority of 37 votes at said election in favor of issuing said bonds. The district judge dissolved the injunction, and the relators appeal, and bring the case here for review.

No briefs were filed. The case was argued orally. *D. H. Morse*, *J. H. Bennett*, and *Williams & Burns*, for relators, contended that the act of February 20th 1875 was unconstitutional and void. *H. Keeler*, and *Martin & Case*, for defendants, maintained that said act was valid.

The opinion of the court was delivered by

BREWER, J.: But a single question is presented in this case for our consideration, and that is, the constitutionality of

the act of the last legislature entitled "An act authorizing townships to issue bonds for relief purposes." (Laws of 1875, p. 53, ch. 42.) The matter has been pressed upon our early attention and decision for these reasons: The time within which these bonds may be issued is limited, the purposes sought to be accomplished thereby must be speedily accomplished. An impression widely prevails, supported by an official opinion of the attorney general, that the act is beyond the scope of the legislative authority, and that the bonds provided for in said act would, if issued, be destitute of legal obligation. Hence it is said, and with great propriety, that an authoritative decision is of public importance; that if the act be constitutional, such townships as desire may avail themselves of its benefits, and negotiate more easily and at higher figures the bonds they may issue, and that, on the other hand, if the act be unconstitutional no steps may be taken under it, the evil of repudiation be avoided, and other measures of relief be resorted to. Impressed with the force of these considerations, we have given the matter our early attention, and proceed now to state briefly the conclusions we have reached.

Two propositions may be considered settled: first, that taxation to be sustained must be for a public purpose; and second, that where municipal bonds are issued, whose payment is provided for solely by taxation, their validity depends upon the question whether the purposes to which the proceeds of such bonds are to be applied are public purposes. *Leavenworth County v. Miller*, 7 Kas., 479; *The Citizens Savings and Loan Association v. The City of Topeka*, recently decided by the supreme court of the United States; (23 Wallace.) It is also conceded by counsel that the entire purpose, or, if there are several, and no rule of apportionment as to the application of the proceeds, that all the purposes must be public. In other words, that the legislature cannot validate bonds for private purposes by declaring that the authorities may apply an indefinite portion of the proceeds to some public purpose. With these preliminary remarks let us turn to the act in

question, and see to what purposes the proceeds of the bonds authorized by it are to be applied. The first four sections provide for the amount of bonds that may be issued, their form, title, time, rate of interest, the limit of the price for which they may be sold, and the placing of the proceeds to the credit of the relief fund. The last clause of section four then reads: "*Provided,* that no part of such fund shall be used except for the specific objects hereinafter named." Sec. 5 is as follows:

"Sec. 5. The trustee, clerk and treasurer of such township, or a majority of them, shall, as soon as practicable, sell and dispose of the bonds issued by them under the authority of this act to the best possible advantage, and invest the proceeds, or so much thereof as in the judgment of said officers may be necessary, for the purpose of providing the destitute citizens of such townships with provisions and with grain for seed and feed; and the officers aforesaid shall distribute such articles of necessity amongst the destitute citizens of such township in proportion to their several necessities, under such rules and regulations as may be prescribed, in accordance with the provisions of the fourth section of this act: *Provided,* That no family shall receive more than seventy-five dollars in value."

The relief of the poor, the care of those who are unable to care for themselves, is among the unquestioned objects of public duty. In obedience to the impulses of common humanity, it is everywhere so recognized. Our own constitution but gives utterance to the universal voice when it says, "The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity, or other misfortune, may have claims upon sympathy and aid of society." Art. 7, § 4. It must be borne in mind however that the term "poor" is used in two senses. We use it in one sense simply as opposed to the term "rich." Thus we speak of the ordinary laborers, mechanics and artisans as poor people, without a thought of describing persons who are other than self-supporting. Indeed, the large majority of our people are poor people, and yet they would feel insulted to be told that they are objects of public charity.

We use the term also to describe that class who are entirely destitute and helpless, and therefore dependent upon public charity. The dictionaries recognize this two-fold sense. Thus, Webster gives these definitions: "1. Destitute of property; wanting in material, riches, or goods; needy, indigent. It is often synonymous with indigent, and with necessitous, denoting extreme want. It is also applied to person who are not entirely destitute of property, but who are not rich; as, a poor man or woman; poor people. 2. (*Law.*) So completely destitute of property as to be entitled to maintenance from the public." Now, when we speak of the relief of the poor as a public duty, and one which may justify taxation, we use the term only in the latter sense. We have no thought of asserting that because a man is not rich, or even because he has nothing but the proceeds of his daily labor, therefore taxation may be upheld in his behalf. Such taxation would be simply an attempt on the part of the state to equalize the property of its citizens. Something more than poverty, in that sense of the term, is essential to charge the state with the duty of support. It is, strictly speaking, the pauper, and not the poor man, who has claims on public charity. It is not one who is in want merely, but one who, being in want, is unable to prevent or remove such want. There is the idea of helplessness as well as of destitution. We speak of those whom society must aid, as the dependent classes, not simply because they do depend on society, but because they cannot do otherwise than thus depend. Cold and harsh as the statement may seem, it is nevertheless true, that the obligation of the state to help, is limited to those who are *unable* to help themselves. It matters not through what the inability arises, whether from age, physical infirmity, or other misfortune; it is enough that it exists. It is doubtless true, that in the actual administration of the poor-laws, many who are not properly entitled thereto receive public support; but failures in the administration of laws do not change the principles upon which they must rest. It is important to bear this distinction in mind, for, as will appear

hereafter, it is really the former and not the latter class which is sought to be relieved under this law. It may be remarked in passing, that it was claimed by counsel as one of the objections to this act, that under the rule, "*expressio unius, exclusio alterius,*" inasmuch as the constitution casts upon the respective counties the care of the destitute, there was an implied prohibition upon casting it elsewhere. Much might be said, and with great force, in support of this objection; but we do not care to decide whether it be well taken or not, much less to rest this case upon it, for such a decision might be construed as an implied recognition of the validity of the principle which we are constrained to believe cannot be sustained.

The purpose of the act, as expressed in the section quoted, is to provide the destitute with provisions and with grain for seed and feed. This legislation must be construed in the light of known facts. For reasons unnecessary here to recount, in some portions of the state last season there was a total, and in others a partial failure of the crops. It was generally understood that many farmers would come to this spring's sowing with little or no seed, and with stock weakened for lack of grain. To make good this lack is the evident purpose of the act, to provide grain for seed and feed. Its aim is not to furnish food to the hungry, clothing to the naked, or fuel to those suffering from cold. It is not the helpless and dependent, whose wants are alone sought to be relieved. If it were, the fact that many who are neither helpless nor dependent might obtain assistance through its administration, would be no valid objection to the constitutionality of the law. It contemplates a class who have fields to till and stock to care for, and purposes to help them with seed for their fields and grain for their stock, that thus they may pursue with better prospects of success their ordinary avocations. It taxes the whole community to assist one class, and that not for the purpose of relieving actual want, but to assist them in their regular occupations. These people are engaged in the business of farming. This business cannot

be successfully carried on without seed, nor without stock strong enough to do the ordinary work. They are destitute of seed, and their stock require grain. Hence the tax upon the community. The principle would be the same if their supply of grain was sufficient, but through the prevalence of the epizooty, or some other disease, their stock had all died. Could a tax be sustained to purchase stock for their ordinary farm work? Or again, suppose some prairie fire driven by a fearful wind sweeps through a county, consuming its fences and farming tools: can a tax be sustained to supply this loss, and enable the farmers to prosecute their labors? Nor need the inquiry be limited to a single class. Were the carpenters or shoemakers, or any other industrial class, located in a separate quarter of a city, and their tools and stock in trade swept away by fire, could a tax be sustained to purchase new sets of tools and new stock in trade to enable them to reprosecute their business and secure support for themselves and families? No distinction in principle can be made between these different supposed cases, and the case at bar. They all rest upon this proposition, that a tax is laid upon the public to furnish to one class the means of carrying on its regular occupation. A further examination of this act will but strengthen the views herein expressed. The four succeeding sections are as follows:

SEC. 6. Each person receiving any portion of the aid provided for in this act, shall take and subscribe the following oath:

I do solemnly swear (or affirm) that I am buying the aid, this day furnished to me, for myself, and not for speculation, but in good faith, for the use of myself and family, and that I am unable to procure the same on my own account.                                      (*Name.*)
    Attest: ————

SEC. 7. Each person receiving any part of the aid provided for in this act shall execute his or her note to such township for an amount equal to the cost of the aid received by him; and if the maker of such note be a married man, the same shall be signed by his wife, which note shall bear the same date as the bonds herein provided for, shall bear interest at the rate of ten per cent. per annum, payable semiannually; and the principal of the note shall be payable in

two equal annual installments; and the said note shall be payable at the treasury of such township, and such township shall have a lien against the real and personal property of the makers of such note until the amount thereof is fully paid. Said township clerks shall immediately make a register of all such notes, in a book to be kept for that purpose, showing the names of the maker or makers of such note or notes, the number and dates thereof, and the amounts of the same, and so soon as such register is made, such notes shall be delivered to the several treasurers of such township, who shall immediately make a like record of such notes, and shall file such notes in their respective offices; and within thirty days after the making of the abstract aforesaid, by the township clerks as aforesaid, said clerks shall make out and deposit in the office of the register of deeds of their respective counties a full and complete certified copy of such abstracts; and such register of deeds shall enter such abstract in a book to be kept by him for that purpose. The note provided for in this section shall be in form substantially as follows:

$—— ————187—

For value received —— promise to pay to the township of —— in the county of ——, the sum of —— dollars, payable in installments as follows: —— dollars on the —— day of —— 187—, and —— dollars on the —— day of —— 187—, with interest on said sums at the rate of ten per cent. per annum until paid; and this note shall be a lien upon the real and personal property now owned or hereafter acquired by —— until the said note is fully paid. ————

SEC. 8. The treasurers of such townships shall collect said notes as they become due, and credit the amounts so collected to the "relief fund" of such township; and it shall be the duty of such treasurers to take all proper and needful action for the purpose of enforcing the claims of such township against the property of the makers of said notes.

SEC. 9. Upon the recommendation of the proper officers of such townships, the proper officer or officers of the county in which such township is situated, shall annually, when other taxes are levied, levy and collect, as other taxes are levied and collected, a sufficient tax to pay the interest on the bonds provided for in this act, as the same falls due, and to provide a sinking fund for the final payment of the principal of said bonds; but in no case shall any such tax be levied if the payments made on the notes provided for in the seventh section of this act shall be sufficient to meet the interest and principal of such bonds as they fall due.

These various provisions show that the idea of the legislature was not the relief of the helpless and dependent, but the assistance of a class temporarily embarrassed. The recipient is required to make oath that he is buying the aid for himself, and not on a speculation. He is to give a note for the amount received, and if a married man the note must also be signed by his wife. The note is to bear the same date and draw the same interest as the bonds, and the interest is payable at the same time as the interest on them. This note is to be a mortgage as well, and the most sweeping kind of a mortgage too, embracing all the real and personal property of the maker, whether owned at the time of its execution or subsequently acquired. And finally, it is made the express duty of the township treasurer to see to the collection of this note, and to take all proper and needful action therefor. Nothing is contemplated but a loan, and a secured loan at that. The credit of the township is invoked to procure funds for the accommodation of a single class temporarily and through unexpected calamity embarrassed in the prosecution of its ordinary business. Can this be called a public purpose? Clearly not. It would doubtless relieve the temporary wants of that class, would enable it to enter upon the business of the year with increased hope and a reasonable expectation of ordinary success in that business, and thus indirectly result in great benefit to the general public. But a similar result would follow the success and prosperity of any other class in business. And if the principle be once recognized in its application to this class, who can tell how soon it may be invoked in aid of another? If one hundred farmers may receive seventy-five dollars each to assist them in their farming, why may not one hundred mechanics with equal propriety receive seventy dollars each to assist them in their business? or a single manufacturer who employs one hundred hands receive seventy-five hundred dollars to assist him in his manufacturing? A difference in amount makes no difference in the principle.

But it may be said that this legislation can be defended

as preventive and anticipatory. To prevent the spread of disease quarantine regulations are enforced, and ships coming from certain places are with all their passengers detained in quarantine even when not a solitary case of sickness exists on board. To prevent ignorance in the voter, the child is compelled to be educated. To prevent crime in the man, the boy is sent to the reform school. To prevent the spread of fire, valuable buildings are pulled down and destroyed. Grant that these parties are not now helpless and dependent; that they are not a public charge. Unless they are able to make and harvest a crop they may become so the ensuing winter. Is it not the part of wisdom to expend a little now to purchase seed and feed, rather than run the risk of having them become paupers hereafter? Under the peculiar circumstances of this case, this argument is a strong one. We are not disposed to belittle the magnitude of the calamity, or make light of the hardships of those upon whom it has principally fallen. If we consulted simply our own feelings we should gladly approve of this, as of every effort to mitigate the severity of the blow. But, though this calamity is great, and though by reason thereof it may seem wise to appropriate out of the public funds a little now to guard against the risk of future want, yet the principle is dangerous and unsound. Let the doorways of taxation be opened, not merely to the relief of present and actual distress, but in anticipation of and to guard against future want, and who can declare the result? How certain must be the expectation of want? how nigh its approach? What efforts must the individual make to ward it off? May he do nothing, and demand that the public make provision to guard against the possibility of future suffering? Must widespread and general calamity precede the granting of such anticipatory relief, or is it enough that individual misfortune or indolence render probable the approach of want? The mere mention of these questions suggests the dangers which would follow the adoption of this as a rule of public conduct. But the attendant dangers of such a rule are not the sole or the controlling

considerations. The relief provided in this act is only indirect, and contingent. There is no direct appropriation to meet future want. The appropriation is for present use, and the relief is contingent on the successful prosecution of the business of the recipients during the ensuing year. If the crop proves a failure, the public funds are lost, and no relief is secured. It is a speculation, which however proper and reasonable for individuals, is not a legitimate part of public duty. The same principle would justify assistance to a mechanic destitute of tools, to enable him to purchase tools, and through their use in his regular calling prevent his becoming a public burden. Indeed, it would be difficult to deny its application in any case where by present assistance, either in the purchase of implements or stock in trade, the recipient might reasonably be expected to earn a subsistence in the prosecution of his regular business. We should expect to find but few authorities to throw any light upon this question. The case of the *Citizens Savings and Loan Association v. The City of Topeka*, heretofore cited, decides that taxation cannot be invoked to assist private manufacturing establishments. The propositions laid down by Mr. Justice Miller in reference thereto are broad. It matters not how great may be the necessities of such an establishment, or how much it may indirectly benefit the community, it cannot be aided by taxation. The same propositions were asserted by the supreme court of Maine in the case of *Allen v. Inhabitants of Joy*, 60 Maine, 124. That was a case of an attempted loan of the credit of a town to certain parties in consideration of their engaging in some manufacturing enterprises for their private emolument. In delivering the opinion of the court C. J. Appleton uses this strong language: "But whether the money raised is to be distributed *per capita*, or loaned, can make no difference in principle. If towns can assess and collect money to be again loaned to such persons as the majority may select for such purposes as it may favor, with such security, or without security, as it may elect, property ceases to be protected in its acquisition or enjoyment. * * * If the loan be made to

Opinion of the Court.

one or more for a particular object, it is favoritism.   It is a discrimination in favor of the particular individual, and a particular industry thereby aided, and is one adverse to and against all individuals, all industries, not thus aided.   If it is to be loaned to all, then it is practically a division of property under the name of a loan.   It is communism incipient, if not perfected.".   But the case most nearly in point is that of *Lowell v. The City of Boston*, recently decided by the supreme court of Massachusetts.   In that as in this, it was the circumstance of a great public calamity, the Boston fire, and a praiseworthy effort on the part of the legislature to provide assistance for the sufferers thereby.   An act was passed authorizing the city of Boston to loan its credit to assist in rebuilding the burnt district.   But this was declared to be outside the purposes for which taxes could be levied, or bonds issued.   We have been able to find nothing more in point than these authorities, and they all point in the same direction as the considerations we have heretofore adverted to.

It is with reluctance that we have reached the conclusion that this act cannot be sustained.   But ours is an unmixed duty, to declare the law as it is, and not as we might wish it to be.   Especially imperative is that duty when as in cases like the present there is in the surrounding circumstances a strong appeal to overlook permanent rules in favor of a present and pressing want.

The judgment of the court below is reversed.

All the Justices concurring.