No. 36,710

THE STATE OF KANSAS, ex rel. A. B. Mitchell, Attorney General, *Plaintiff*, v. JOHN G. TOWNSEND, Chairman, G. A. CHASE and L. B. TOLIN, Members of the County Board of Social Welfare of Jackson County, and the Board of County Commissioners of Jackson County, *Defendants*.

Opinion filed July 26, 1946.

*Harold R. Fatzer,* assistant attorney general, argued the cause, and *A. B. Mitchell,* attorney general, and *Marvin E. Larson* of Topeka, were on the briefs for the plaintiff.

*E. V. Bruce,* of Holton, argued the cause for the defendants.

The opinion of the court was delivered by

HOCH, J.: This is an original proceeding in mandamus brought by the state to require the Board of Social Welfare of Jackson county to adopt the social welfare budget fixed for Jackson county by the State Board of Social Welfare and to require the board of county commissioners of Jackson county to levy a three-mill tax and in addition thereto allocate such part of the sales tax residue as may be necessary to meet the social welfare requirements as fixed in the budget. The state moves for judgment on the pleadings and for a peremptory writ.

The essential facts may be briefly stated. On May 17, 1946, and pursuant to the statute (G. S. 1945 Supp. 39-713 [*g*]), the Jackson County Board of Social Welfare—hereinafter called the county board—submitted to the State Board of Social Welfare—hereinafter called the state board—its proposed county welfare budget for 1947 in the sum of $199,826. On May 22, 1946, the state board advised the county board that the proposed budget could not be financed as proposed by the county by a three-mill levy and the distribution to the county as a taxing unit of its statutory share of the county's sales tax residue. On May 28, 1946, the county board submitted a second proposed social welfare budget in the sum of $185,188.25, together with a statement that the county board was not willing to make a levy in excess of 2.522 mills, nor to credit to the welfare fund more than the statutory share of the 1946 residue sales tax money. On June 22, 1946, the state board advised the county board that the second proposed budget would be inadequate to meet the county's social welfare needs, and was disapproved. The county board was directed to adopt the budget first proposed or to accept the second budget as corrected by the state board. On June 26, the county board took action, refusing to adopt a budget in excess of $185,188.25, and refused to levy a three-mill tax or to make an allocation from the sales tax residue sufficient to finance a budget of $199,826. This proceeding in mandamus followed.

It is unnecessary to set out all the items in the proposed budgets,

which include the anticipated and substantial amounts to be received by the county from the federal government under the federal Social Security Act (Public Act No. 271—74th Congress, 42 U. S. C. A., § 301 *et seq.*), and from the state under provisions of law not here in. question. None of the items of the budgets is brought in issue here except those relating to the ad valorem levy to be made by the board of county commissioners, and the allocation, if any, to be made from the county's sales tax residue for the benefit of the welfare fund. It is the contention of the state board that it has the final power and duty to determine the county's welfare budget; that it is the duty of the county board to adopt the budget so fixed and of the board of county commissioners to make the levies necessary to finance the budget, and that if a three-mill levy is insufficient to provide the necessary funds, it is the mandatory duty of the county board under sections 39-713 (*g*); 39-715, and 79-3621, G. S. 1945 Supp., to allocate to the welfare budget whatever part of the county's sales tax residue funds may be necessary to meet the welfare budget requirements. The county board contends that the statute upon which the state principally relies (G. S. 1945 Supp. 39-713 [*g*]) does not purport to give to the state board authority to determine the amount of the county's welfare budget and that if the statute is to be so construed, it is unconstitutional in that it attempts to delegate to the state board the legislative and administrative functions belonging to the board of county commissioners.

Section 4, article 7, of the Kansas constitution as originally adopted, made it the duty of the counties to provide for those inhabitants who, by reason of age, infirmity or other misfortune, may have claims upon the sympathy and aid of society. By an amendment submitted at a special legislative session in 1936 and adopted at the general election in November, 1936, this provision was added: *"Provided, however,* The state may participate financially in such aid and supervise and control the administration thereof." It may well be that the state would have had power to grant financial aid to those in need even without this amendment (see *State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 914, 28 P. 2d 770). However that may be, it was the purpose of the amendment, well understood, not only to make it clear that the state might extend such aid but that it might supervise and control the administration of a state-wide system of such financial aid.

Following the adoption of this amendment in November, 1936, the succeeding legislature enacted a comprehensive Social Welfare Act (Laws 1937, ch. 327, now G. S. 1945 Supp. ch. 39, art. 7). It was clearly the legislative intent by this act to establish a state-wide program of social welfare, coördinated with the federal social security act. The opening paragraph of the act reads, in part:

"It is hereby declared the purpose and policy of the state in assisting the counties, in aiding and supervising the directing of the welfare work therein, to provide an effective uniform system of welfare work for the state; to promote efficiency in the work; assist the counties in the financing of the welfare work; and to comply with the conditions provided for obtaining federal grants for welfare work as set forth in Public No. 271—74th Congress (H. R. 7260) or amendments thereof, and the rules and regulations of the federal social security board relating thereto."

There can be no mistake about the legislative intent to put Kansas in line to receive financial aid from federal funds for social welfare purposes. A State Board of Social Welfare was created and given broad powers (G. S. 1945 Supp. 39-708). The members of the boards of county commissioners were constituted as county social welfare boards and such boards directed to "provide aid, assistance and service on the basis of need in the county *in accordance with state laws and the rules and regulations of the state board.*" (G. S. 1945 Supp. 39-711.) The county boards are subject to the jurisdiction of the state board. Concerning the county board, it was said in *Dellinger v. Harper County Social Welfare Board,* 155 Kan. 207, 211, 124 P. 2d 513:

"It is not even an independent governmental agency, but is subordinate to the state board. (G. S. 1941 Supp. 39-708 *b, d, s.*) The powers and duties of the county social welfare agency are to be exercised and discharged according to rules and regulations prescribed by the state board. (G. S. 1941 Supp. 39-711.)"

In the exercise of a power and duty imposed by the statute (G. S. 1945 Supp. 39-701, 39-708), the state board on April 16, 1946, adopted minimum standards for assistance, with the purpose of achieving a reasonably consistent social welfare program throughout the state. Certainly it was not the legislative view that absolutely equal provision could be secured in all the counties in the state, with their varying needs and conditions. Nor is there anything to indicate that either the state board or the federal board contemplated the achievement of absolute equality of assistance in all cases. What was clearly intended was to secure a rea-

sonably consistent state-wide program, directed and controlled by the state agency, and supported by a power to require the levying of taxes in each county reasonably adequate, together with the state and federal aid and other sources of income, to provide the funds necessary to meet the standard of assistance provided by the plan adopted by the state board.

To this end the statute (G. S. 1945 Supp. 39-713 [g]) provides that the social welfare budget prepared by the county board shall be submitted to the state board for approval; that the state board shall approve it or "make such recommendations and requirements as it shall deem advisable" and return it to the county board on or before June twenty-fifth of each year. The county board is directed to correct its budget "in accordance with the directions of the state board and shall submit the same as corrected to the board of county commissioners." Thereupon "it shall be the duty of the board of county commissioners to make such levies upon the taxable property of the county as is necessary to raise the funds required by the county welfare budget: *Provided,* The levy shall not be in excess of three mills, and the first mill so levied shall be within and subject to the aggregate tax levy limitation prescribed by section 79-1947 of the General Statutes of 1935, or any amendments thereto, and the second and third mill so levied may be levied outside of said aggregate levy limitation."

There can be no doubt that the legislature intended to give to the state board the power to determine what the county's welfare budget should be, in order to be reasonably in line with the uniform standard of assistance fixed for application throughout the state. And it is equally clear that the county may be required to raise a fund which would represent a three-mill ad valorem levy. To this extent we agree with the contention of the state.

The provision for an ad valorem levy not in excess of three mills (G. S. 1945 Supp. 39-713 [g]) must be construed in connection with the provisions of section 79-3621, G. S. 1945 Supp., which deals with the distribution of sales tax residue to the counties and by the counties to the various tax-levying subdivisions, including the county itself as a political subdivision. In substance, the statute provides that the sales tax moneys distributed by the state to the various counties shall be distributed among the various taxing subdivisions which meet the requirements of the act, under a statutory formula which need not here be outlined since it is not brought

in issue. The primary provision is that only those political subdivisions are entitled to participate in this distribution of sales tax residue which file a budget showing the amount of sales tax distribution to which they are entitled and which show a proposed tax levy which will produce what the maximum levy provided by law would produce, less the amount to be received as their statutory share of sales tax residue. In other words, the sales tax residue is to be used in general for reduction of the levies which might otherwise be made. With reference to the county social welfare fund, the statute expressly provides: *"Provided,* That the limitations herein shall not apply to the county social welfare fund prior to the end of the budget year under which the county is operating at the time this act takes effect." Since the act took effect on April 9, 1937, the provision for distribution of sales tax residue now applies to the social welfare levy the same as to other levies. It follows that if the county is required to raise a fund for welfare purposes which would be produced by a three-mill levy, the county may distribute the statutory share of sales tax residue to the welfare fund and reduce the levy accordingly. In other words, the levy made must produce, together with the distributive share of sales tax residue, as much as would be produced by a three-mill levy. This is the clear intent of the statute. And the state board is not concerned whether the statutory limit is raised by a three-mill levy or partly by distribution of sales tax residue and the remainder by a levy less than three mills. It is interested only in a contribution by the county to the county welfare fund equal to what the maximum levy would produce. It is clear that if a three-mill levy is made, the welfare fund may not receive any of the statutory distribution of sales tax residue, since a reduction of the levy below the maximum is a condition precedent to receiving any part of such distribution.

The state contends, however, that if a three-mill levy, together with other available revenues, will not be sufficient to finance the county welfare budget, it is then the duty of the county commissioners to allocate such part or all of the county's entire sales tax residue as may be necessary for that purpose. It bases its contention upon a provision of the sales tax act (Laws 1937, ch. 374, now G. S. 1945 Supp. ch. 79, art. 36) found in the section which deals with distribution of the sales tax residue, and which we have

just been considering. (G. S. 1945 Supp. 79-3621.) The provision reads:

"*Provided,* That in any county the commissioners may by resolution, after a public hearing duly held on or before July 20 and upon twenty days' notice by publication in some newspaper of general circulation in the county, allocate all or any part of the entire amount of such residue fund apportioned to such counties (all funds inclusive) for social welfare purposes: *Provided,* The total amount so allocated shall not exceed the amount necessary, when added to all other revenue available, including revenue to be derived from the three-mill tax levy hereinafter required, to finance the adopted budget of expenditures for social welfare fund for the next succeeding budget year, nor shall such allocation be made unless the county makes in the current year an ad valorem tax levy of at least three mills for the county social welfare fund for expenditure in the next succeeding budget year."

The state contends that this provision, together with the general provisions relating to financing the welfare budget, is mandatory and leaves no discretion in the county commissioners. We find nothing in the statute to support that construction. The provision is that if a three-mill levy does not, together with other revenues available to the county welfare fund, fully finance the budget fixed by the state board, the county commissioners *may* allocate all or any part of the sales tax residue to the social welfare fund, and then only after public hearing duly held on or before July 20. The purpose of this provision is obvious and we find no uncertainty about it. The county must provide, if the welfare budget requires it, a fund equal to what would be raised by a three-mill levy. If more is needed fully to finance the welfare budget which the state board thinks necessary, the commissioners, after public hearing, may allocate to the welfare fund all or any part of the sales tax residue. There is nothing in the provision to indicate that they are required to do so. No words could be used that would more plainly show that such allocation is discretionary with the county commissioners. If the allocation of the sales tax residue is mandatory, then there is no meaning whatever in the provision for a public hearing. But the purpose of a public hearing is apparent. If the other funds are to be deprived of their normal statutory share of the sales tax residue, there is a very real reason for a public hearing at which those so interested may have opportunity to be heard. But if the county commissioners have no discretion and must make the allocation at the direction of the state board, why should there be a public hearing? No answer to that query is suggested by the

state. Whether, if the county board decides to consider making such allocation, it may hold the hearing after July 20, we need not here determine. There are, however, obvious reasons why the matter should be decided before the statutory distribution of the sales tax residue has been made.

We conclude that the state board has the authority and the duty to formulate a state-wide program of social welfare to the end that there may be reasonably uniform assistance to persons entitled thereto, and that having adopted such a state-wide program, it has power to advise the counties what the county welfare budget should be to conform to the state-wide program or standard. The state board, however, is not a tax-levying body and the statutes alone determine what means the counties are required to take toward financing the county welfare budget as fixed by the state board. Not because of any direction from the board, but because of the mandate of the statute, the county is required to assist in financing the budget by making available for such purposes a fund equal to what can be raised by a three-mill ad valorem tax upon the tangible property of the county. The statute does not require the county to do more than that, but does authorize the board of county commissioners to allocate all or any part of the sales tax residue to the welfare fund, after public hearing with notice, provided a three-mill levy has first been made.

We are advised by the state that a three-mill levy would provide, together with the other funds available, a welfare fund of $194,083, which is $5,743 less than the budget fixed by the state board, and approximately $8,895 more than the budget proposed by the county board. Those figures are not questioned, and we accept them as accurate. Certainly a county welfare budget of $194,083 for Jackson county is a very substantial one and indicates a legislative intent to provide a far-reaching, state-wide social welfare program in full coöperation with federal requirements. In any event, it is our function to construe and not to write the statutes.

In view of the construction given to the statute, there is no need to discuss at length the contention of defendants that the statute is unconstitutional if construed as urged by the state. Section 4, article 7 of the constitution of this state provides that "the respective counties of the state shall provide, *as may be prescribed by law*, for those inhabitants who, by reason of age, infirmity or other misfortune, may have claims upon the sympathy and aid of society,"

and that "the state may participate financially in such aid and supervise and control the administration thereof." Defendants contend that if the social welfare act (in particular G. S. 1945 Supp. 39-713 [*g*]) be construed as giving the state board unlimited power to require such levies as it determines to be necessary, the statute constitutes an invalid delegation of legislative power to the state board. There is much to support that view. Legislative power is vested exclusively in the state legislature except that it is provided in section 21, article 2 of the constitution, that "The legislature may confer upon tribunals transacting the county business of the several counties, such powers of local legislation and administration as it shall deem expedient." No such delegation of legislative power to a state board or agency is provided for in the constitution; and it is well established law that in the absence of such provision, legislative power cannot be delegated. Administrative boards may be clothed with fact-finding powers and may be empowered to take certain action upon the basis of the facts found, under a well-defined guide or yardstick. Action taken by a state board under such a fixed standard or yardstick constitutes administration and not legislation. But the state here contends that the instant statute gives to the state board unlimited power to require any levy or allocation of sales tax residue which it considers necessary. Such a construction would raise a serious question of constitutionality. But we do not so construe the statute. The legislature itself laid down the limitations upon the levy which the counties may be required to make. And as heretofore noted, the counties are directed, under section 4, article 7, of the constitution, to provide relief assistance "as may be prescribed by law."

When the legislature fixed a maximum levy of three mills for the welfare fund, it would be unreasonable to say that any levy of that amount or any lesser levy is not one "prescribed by law." As to the right of the state to extend financial aid to the counties for social welfare purposes and to supervise and control the administration thereof, that was made clear by the amendment to section 4, article 7, adopted in November, 1936.

Clearly the legislature did not intend to require the county commissioners to take the sales tax residue away from other taxing units and other funds and allocate it to the welfare fund. In language as plain as could be framed, such allocation was made discretionary, and then only after public hearing. We find nothing

in the constitution which invalidates a statute under which a maximum levy of three mills may be required in each county for effectuating the state-wide program of social welfare.

Somewhat by way of repetition, but in order to make our conclusions perfectly clear, we hold that the defendant county board of social welfare is required to submit the budget as approved by the state board, and that in case the budget calls for it, the board of county commissioners is required either to make a levy of three mills toward financing the budget, or to raise an equal amount by distributing to the county welfare fund its statutory distributive share of the sales tax residue and reducing the levy accordingly. We hold further that the county commissioners are not required by law to allocate all or part of the sales tax residue, in addition to providing for the welfare fund the amount which may be produced by a three-mill levy.

Finally, the state contends that the writ should issue for the reason that the defendants have not exhausted their administrative remedies by taking an appeal to the appeals committee. In the first place, mandamus does not lie to compel officials to perform an official act unless it clearly appears that it is their duty to do so. (*Burke v. State Board of Canvassers*, 152 Kan. 826, 830, 107 P. 2d 773.) Petitioners may not escape this burden by showing that the defendants took no appeal. Whether defendants took an appeal or not, petitioners must show that it was clearly the statutory duty of the defendants to take the action sought. In the next place, it is at least doubtful whether the appeal statute upon which the state relies (G. S. 1945 Supp. 75-3306) refers to appeals by a county board in a case such as this. The statute refers primarily to appeals by applicants for assistance from action by the county boards. Furthermore, it would be a futile thing to require the county board to take an appeal in a situation such as is here presented. We find no merit in the contention.

The writ is allowed in part and denied in part, in harmony with the conclusions stated.

SMITH, J. (dissenting): I find myself unable to agree with the conclusion reached by the majority. It is desired to hand down this opinion as quickly as possible so I will state my position briefly.

Nobody contends that the board of social welfare is a tax levying body. However, this court holds in subparagraph (*a*) of the sylla-

bus, that "the state board of social welfare has the power and the duty to formulate a state-wide program of social welfare assistance and to advise the county boards what their welfare budgets would be in order to conform fully with such program." I do not see how we can consistently so hold and not hold it to be the duty of the board of county commissioners to raise whatever funds are necessary to meet that budget. There is a provision for a three-mill levy and a provision under G. S. 1945 Supp. 79-3621, that the board of county commissioners has power to take all or any part of the sales tax residue fund to meet the adopted budget for expenses of social welfare for the next succeeding year. I think it was the intention of the legislature that this provision should be mandatory on the board where it was found to be necessary to meet the budget.

If, as this court holds, the state board has the power to fix the amount of the budget to be spent for social welfare in each county of the state it is idle for us to hold that it is not the duty of the county commissioners to raise by all means within their power, that is, the three-mill levy and the allocation of the sales tax money, the funds necessary to meet that budget.

As it now stands, we give the needy of the counties a budget but we withhold the money to meet the budget. I am unable to see just what benefit that is going to do the needy of the counties. This whole affair is all part of the running fight that has been going on since 1937 between the county commissioners of the various counties and the board of social welfare as to who is going to administer the welfare program in the various counties. I had thought it had been settled but apparently it has not.