No. 68,678

MARTHA BULLOCK, *et al., Appellants,* v. DONNA WHITEMAN, In Her Official Capacity as Secretary of the Department of Social and Rehabilitation Services, a Subdivision of the State of Kansas, *Appellee.*

(865 P.2d 197)

Opinion filed December 10, 1993.

*Lowell C. Paul,* of Kansas Legal Services, Inc., of Topeka, argued the cause, and *Marilyn Harp,* of Legal Services of Wichita, of Wichita, was with him on the brief for appellants.

*Reid Stacey,* of Department of Social and Rehabilitation Services, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a class action against the Secretary of the Department of Social and Rehabilitation Services (SRS). Plaintiffs contend that the proposed narrowing of eligibility for General Assistance (GA) benefits and reduction in Medikan benefits violate Article 7, § 4 of the Kansas Constitution and the equal protection guarantees of the Kansas and United States Constitutions. Plaintiffs are recipients of benefits under the GA and Medikan programs. The district court held in favor of defendant, and plaintiffs appeal therefrom.

When this action was commenced in December of 1989, it challenged regulations to take effect on January 1, 1990. The regulations would have eliminated all Medikan benefits and reduced GA payments by $9 per month per recipient. The issues were vigorously litigated, and, on April 9, 1991, the district court held that the proposed regulations had not been lawfully prom-

ulgated. The issues were all procedural in nature. While various post-trial motions were pending, SRS published notice of new proposed regulations concerning GA eligibility and Medikan benefits which would become effective on July 1, 1991. The litigation relative to the January 1, 1990, proposed regulations stopped in its tracks. An amended petition was filed challenging the validity of the July 1, 1991, proposed regulations. The issues before us relate wholly to the 1991 regulations.

The issues before us are as follows:

1. Does the action of SRS in seeking to eliminate cash and medical assistance to certain members of the plaintiff class violate Article 7, § 4 of the Kansas Constitution which states the respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who may have claims upon the aid of society?

2. Does the action of defendant in seeking to eliminate or substantially reduce cash and medical assistance to certain members of the plaintiff class violate the equal protection guarantees of the Kansas and United States Constitutions?

At this point, some background information must be provided in order to understand the issues.

GA, a wholly state funded program, provides cash assistance to persons in need. Eligibility is determined based on need, income, and assets. See K.S.A. 1992 Supp. 39-709(d)(1)(A). An applicant's income is adjusted through deductions for work and child care expenses. If the adjusted income is over a certain amount, no need is considered to be present and benefits are not available. Applicants also cannot have any more than $1,000 in nonexempt assets. Exemptions are allowed for homes, up to $1,500 in face value of life insurance, personal effects, household furnishings, keepsakes, and prepaid burial and funeral plans. K.A.R. 30-4-108(c); K.A.R. 30-4-109(c). Persons receiving GA also are eligible for Medikan, a medical benefits program. Medikan is also wholly state funded.

SRS also administers several benefit programs which are jointly funded through the federal government and the State with the former providing the bulk of the funds. A brief and highly oversimplified discussion of one of these programs is necessary to

understand the role of GA and Medikan. Aid to Families with Dependent Children (AFDC) provides cash assistance to needy families with children and to pregnant women in their third trimester. The federal government has the ultimate control over the eligibility requirements and benefits available.

Social Security (SS) and Supplemental Security Income (SSI) are programs which are fully funded and administered by the federal government. SSI provides monthly cash assistance to needy persons who are age 65 and over, blind, or disabled as defined by federal law. Obtaining SS or SSI benefits based upon disability is often a lengthy process. Eligibility requires that persons be unable to engage in any substantial gainful activity due to physical or mental impairment which can be expected to result in death or last for at least 12 continuous months. 42 U.S.C. § 423(d)(1)(a) (1988).

Medicaid provides medical benefits to persons receiving cash assistance under AFDC, SSI, and SS disability and in certain other circumstances. The federal government pays 57 percent of the cost of Medicaid in Kansas.

By setting up this framework, we can place GA and Medikan in perspective. The district court made the following findings of fact relative to these programs:

"14. General Assistance . . . furnishes cash assistance to needy Kansans who are not eligible for any other cash assistance program funded solely or partially with federal funds. As with AFDC, the Kansas Legislature has stated that GA recipients 'must have insufficient income or resources to provide a reasonable subsistence compatible with decency and health.' K.S.A. 39-709(d)(1)(A).

"General Assistance recipients include needy families who do not meet the technical requirements of AFDC, pregnant women (during the first two trimesters), disabled adults who have not been approved for Social Security or Supplemental Security Income disability, 'elderly' persons (aged 55-64), persons in residential drug treatment programs and persons recently released from state mental hospitals.

"During fiscal year 1990, 15,728 Kansans received GA. In December, 1989, those recipients included 876 adults and 1,176 children in families, 275 pregnant women, 3,672 disabled adults, 656 persons aged 55-64, 18 people in residential drug treatment programs, and 58 people recently released from state mental hospitals.

"15. All recipients of GA cash assistance are eligible for medical services, through the MediKan program. Children and pregnant women are also

eligible for Medicaid benefits, and, therefore, participate in the Medicaid program.

"16. The GA disabled are typically single individuals with a mental or physical handicap which creates a substantial barrier to gainful employment. Many are awaiting a federal disability decision and, if they are successful, SRS will be reimbursed for their cash benefits and will receive retroactive federal matching payments for their medical assistance. Others are not sufficiently disabled to receive federal disability benefits, but still are untrained, ill-educated and often have psychological impairments or suffer from chronic drug or alcohol dependency.

"17. The GA elderly are all aged 55 through 64. Physical and mental conditions similar to those of the disabled keep them from any long-term employment. The median age is 59. The majority have done manual labor all of their lives but, because of injury or physical or mental illness, can no longer do so. Many are awaiting federal disability decisions. If they qualify for a federal disability program, reimbursement and retroactive matching payments are made to SRS by the federal government, as in the case of the GA disabled.

"18. All GA recipients must meet income and resource eligibility rules.

"19. Every applicant for or recipient of GA benefits is ineligible for assistance if that person, without good cause, refuses a referral for or offer of employment, terminates employment, or is terminated from employment for good cause."

The Secretary of SRS is authorized to adopt rules and regulations setting criteria for eligibility for GA, including consideration of factors such as age and physical or mental conditions. K.S.A. 1992 Supp. 39-709(d)(1)(A).

Prior to the proposed changes, K.A.R. 30-4-90 extended GA benefits to, *inter alia*, "a person who has been medically determined to be physically incapacitated as set forth in K.A.R. 30-4-63(a)(2), except that the condition must only constitute a substantial handicap to gainful employment" and persons aged 55 or older. A doctor's statement was accepted as proof of incapacitation. Persons aged 55 or older did not have to show physical incapacity. K.A.R. 30-4-63(a)(2) included a provision that required the physical incapacity to extend beyond 30 days. SRS, due to budgetary constraints, proposed extending the 30-day period to 6 months and requiring persons aged 55 or older to also be physically incapacitated for the 6-month period before benefits would be granted. 10 Kan. Reg. 567 (1991). Medical services available under Medikan were sharply reduced under the pro-

posed regulations. The district court's findings in this regard are as follows:

"8. For those who continued to be eligible for GA, the proposed regulations provided for sharply reduced MediKan benefits. Coverage for the following services was eliminated under MediKan:

a. All hospital services, except out-patient diagnostic laboratory and radiology services;

b. All physician services, except for twelve office visits per calendar year and diagnostic laboratory and radiology services;

c. Local health department services;

d. Advanced nurse practitioner and registered nurse anesthetist services;

e. Targeted case management services;

f. Hospice services;

g. Rural health clinic services;

h. Home health services;

i. Dental services;

j. Chiropractic services;

k. Podiatric services;

l. Psychological services;

m. Hearing services;

n. Ambulance services;

o. Orthotic and prosthetic services;

p. Free-standing inpatient psychiatric services;

q. Family planning services;

r. Ambulatory surgical center services; and

s. Substance abuse services.

"9. Additional reductions were proposed for community mental health services.

"10. The reason given for all of these reductions in services was that they were necessary to allow the agency to stay within fiscal year 1992 appropriations.

"11. After the reductions in coverage proposed by the Defendant, the scope of services covered by MediKan would be limited to:

a. Twelve office visits per year to a physician, plus diagnostic laboratory and radiology services performed by a physician;

b. Prescription drugs;

c. Durable medical equipment and supplies, except for prosthetics and orthotics;

d. Out-patient hospital diagnostic laboratory and radiology services; and

e. Reduced community mental health center and partial hospitalization services.

"12. These proposed temporary regulations were adopted at a State Rules and Regulations Board meeting on June 10, 1991. These temporary regulations were intended to be effective from July 1, 1991, through October

30, 1991. A temporary restraining order issued on June 26, 1991, however, barred Defendant from implementing these temporary regulations."

Plaintiffs contend that: (1) the elimination of the "elderly" classification (those aged 55-64) from GA and Medikan benefits except as to individuals within that age group who can qualify as disabled; (2) the extension of the disability requirement from one to six months; and (3) the reduction in Medikan benefits violate Article 7, § 4 of the Kansas Constitution. This constitutional provision provides:

"**Aged and infirm persons; financial aid; state participation.** The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity or other misfortune, may have claims upon the aid of society. The state may participate financially in such aid and supervise and control the administration thereof."

The section, as originally ratified, read: "The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity or other misfortune, may have claims upon the sympathy and aid of society." It has been amended twice since the ratification of our constitution, once in 1936 and later in 1972. L. 1936, ch. 4; L. 1972, ch. 394, § 1. The former amendment at least clarified, if not added, the authority for the State to participate in the payment and supervision of aid to the aged and infirm. See *State, ex rel., v. Jackson County Board of Social Welfare,* 161 Kan. 672, 674, 171 P.2d 651 (1946). The latter amendment removed reference to claims on the sympathy of society.

Before proceeding further, some comments need to be made on the district court's memorandum decision herein. Its findings of fact and conclusions of law extend over some 43 pages, yet are concise in summarizing and discussing the evidence and provide a well-reasoned analysis of the issues. We adopt the following portions of the district court's memorandum decision.

"15. As noted above, Article 7, Section 4 of the Kansas Constitution mandates that 'The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who by reason of age, infirmity or other misfortune, may have claims upon the aid of society.' Since 1973, the State has assumed control of social welfare programs and placed the powers, duties, and functions of the county social welfare boards in the hands of the Secretary. K.S.A. 39-744.

"16. Our Supreme Court has consistently characterized the constitutional language as mandatory. Article 7, Section 4 'gives voice to a universally recognized state duty, to be discharged in the interest of the public welfare.' *Beck v. Shawnee County*, 105 Kan. 325, 330 (1919). In *Caton & Starr v. Osborne County*, 110 Kan. 711 (1922), the Court stated: 'The constitution *enjoins this care and commands that counties of the state shall provide* for the poor and those who have claims upon the sympathy and aid of society.' 110 Kan. at 714 (emphasis added). Finally, in *State ex rel. Mitchell v. Jackson County Board of Social Welfare*, 161 Kan. 672, 674 (1946), the court put in precise terms that Article 7, Section 4 'made it the *duty* of the counties to provide for those inhabitants who, by reason of age, infirmity or other misfortune, may have claims upon the sympathy and aid of society.' (emphasis added).

"17. It perhaps begs the question to conclude that the constitutional language imposes a duty. The real issue is the depth, and breadth, of that duty.

"Obviously Article 7, Section 4 does not require state support to anyone who simply claims to be needy. By its terms, the constitutional provision is limited to such provision of the poor 'as may be prescribed by law.' Thus, in *Gleason v. Sedgwick County*, 92 Kan. 632 (1914), a blind, destitute, disabled plaintiff, without family able to support him, was not entitled to a pension 'sufficient for his maintenance.' The court emphasized that plaintiff was receiving a pension of ten dollars per month, that the applicable statute authorized but did not require pensions up to fifty dollars per month, and that the Board of County Commissioners had deemed an increased pension to be unwise.

"18. In short, the legislative history of a similar provision in the New York State Constitution provides an accurate description of Article 7, Section 4:

'While the obligation expressed in this recommendation is mandatory, in that the Legislature shall provide for the aid, care and support of persons in need, the manner and means by which it shall do so are discretionary.' *Tucker v. Toia*, 371 N.E.2d 449, 452, 43 N.Y.2d 1 (1977).

"19. This notion of discretionary means to carry out a mandatory duty was developed further in *Bernstein v. Toia*, 402 N.Y.S.2d 342, 348, 737 N.E.2d 238, 43 N.Y.2d 437 (1977):

'There remains only petitioners' contention that the regulation in question by failing to provide them with the shelter allowance each deems necessary, having in regard his or her individual circumstances, violated section 1 of article XVII of the State constitution. That section provides: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine." We do not read this declaration and precept as a mandate that public assistance must be granted on an individual basis in every instance, thus precluding recourse to the flat grant concept, or indeed

as commanding that, in carrying out the constitutional duty to provide aid, care and support of the needy, the State must always meet in full measure all the legitimate needs of each recipient. When, as here, the over-all consequence of the method of distribution of aid to the needy adopted initially by the Legislature, and subsequently by the department charged with executing the social services program, is reasonably expected to be in furtherance of the optimum utilization of public assistance funds, there has been no violation of the constitutional command.' 402 N.Y.S.2d, 348 (1977).

"20. In the absence of any Kansas authorities directly on point, this Court finds persuasive and adopts the approach of the New York Court of Appeals, as expressed above.

"21. The question then seems to be 'Were the changes proposed reasonably expected to be in furtherance of the optimum utilization of public assistance funds?'

."22. One difficulty in addressing that question is that the record contains no evidence explaining the rationale for previously including as eligible categories those aged 55 to 64 and those with a disability expected to last at least one month but less than six months.

"In other words, K.S.A. 39-709(d)(1)(A) sets forth as requirements for General Assistance that

a needy person must have insufficient income or resources to provide a reasonable subsistence compatible with decency and health and, except as provided for transitional assistance, be a member of a family in which a minor child or pregnant woman resides or be unable to engage in employment.

This record contains nothing to account for the Secretary's decision, at some unspecified time in the past, to include those aged 55-64 or those with a disability of at least one month but less than six months within the population eligible to receive General Assistance.

"23. The record certainly does contain evidence which would justify a decision to provide General Assistance to those populations . . . .

. . . .

"25. Just as the record contains no clear statement of the reason for including the two groups in the GA population, it likewise contains no clear explanation for the decision to remove these two groups from GA eligibility. The agency impact statement estimated that 1,200 GA clients (of a total of 5,000) would lose their benefits due to the eligibility changes. That estimate assumed that 50% of the GA recipients aged 55-64 would be able to maintain their eligibility by qualifying under the new disability standard.

"The agency impact statement concluded that 'Coverage for the more vulnerable groups, including children and the disabled, is protected under this change.'

"Karen Crist-Terrill, a rehabilitation counselor and vocational expert, noted that there is a distinction between disability and unemployability. Disability refers to a physical or mental impediment to employment. Unem-

ployability refers to the lack of transferable skills necessary to obtain employment. She noted that an individual aged 55-64 with no high school diploma and a history of manual labor has only a slim chance of obtaining employment. She referred to the latest available statistical data which reveals that, nationwide, persons aged 55-64 have a mean duration of unemployment of 24.8 weeks, just over six months.

"Kandy Shortle is the S.R.S. Administrator of Income Maintenance. She participated in the discussions which produced the program changes at issue here. She testified that the working group was instructed to develop a proposal for funding GA and MediKan at a lower level. The working group assumed that those aged 55-64, who did not qualify as disabled, were able-bodied and capable of seeking employment. The working group had no data to indicate and did not assume that those who lost benefits would be capable of obtaining employment. Similarly, the working group assumed that those individuals with a disability expected to last less than six months could rely on family or charity for support during their disability, and successfully support themselves once the disability had ended. The working group did not base those assumptions on any data. The working group did not rely on or identify any external factor which had reduced the needs of those receiving GA who would be excluded under the modifications. The conclusion of the working group was that S.R.S.'s priority should be to maintain GA for families, in light of the vulnerability of the children of those families.

"John Alquest testified that the working group was provided with a figure of 3.9 million dollars, and modified MediKan to fit within that amount. The record does not indicate the basis for that 3.9 million dollar figure.

"26. The Plaintiffs' position, in effect, is that once S.R.S. includes a group within the GA population, benefits for that group may not be eliminated. The definition of needy, according to Plaintiffs, cannot be refined or modified. Plaintiffs provide no case law to support this position, nor do they allege that the eligibility changes violate a specific Kansas statute. Plaintiffs, in fact, acknowledge that the statutory provisions for GA and MediKan are expressed in permissive, not mandatory language. Finally, Plaintiffs have not established that Defendant acted unreasonably in limiting GA to those considered least able to cope with or recover from their economic misfortune.

"It may be purely coincidental that the average period of unemployment for those aged 55-64 is approximately six months—the same period used to define GA eligibility for the disabled. But the record does provide a basis for distinguishing between the disabled and those who are unemployable (lack transferable job skills).

"Finally, it cannot be said—and Plaintiff does not argue—that the Defendant acted unreasonably in requiring a certain degree of permanency (6 months) before a disability warrants GA benefits. Such a yardstick provides at least a rough method of identifying those who are unable to provide for their own basic needs. *See Beck v. Shawnee County*, 105 Kan. at 329-30; *State ex rel. Griffith v. Osawkee Township*, 14 Kan. 418, 421 (1875).

"27. Plaintiffs rely on *Tucker v. Toia*, 400 N.Y.S.2d 228, 231, 371 N.E.2d 449 (1977), which held that a New York statute violated the affirmative duty to aid the needy imposed by the New York State Constitution. As quoted by Plaintiffs:

> 'The *effect* of the questioned statute is plain: it would *effectively* deny public assistance to persons under the age of 21 who are concededly needy, often through no fault of their own, who meet all the criteria developed by the Legislature for determining need, solely on the ground that they have not obtained a final disposition in a support proceeding. Certainly, the statute is in furtherance of a valid State objective, for it is intended to prevent unnecessary welfare expenditures by placing the burden of supporting persons under 21 upon their legally responsible relatives. This valid purpose, however, cannot be achieved by methods which ignore the realities of the needy's plight and the State's affirmative obligation to aid all its needy.' (emphasis added).

"There are four problems with Plaintiffs' reliance on *Tucker*. First, it is not conceded in this case that those who lack a permanent (6 month) disability are 'needy.' Secondly, this is a situation where the definition of needy has been altered, not a circumstance where an admittedly needy individual is denied assistance. Third, the statute in *Tucker* required a needy individual under the age of 21 to file suit and obtain a judgment requiring a legally responsible relative to contribute to that individual's support. The Court of Appeals rejected the use of such a technical requirement to deny aid to a qualified individual. No such technical requirements are at issue here. Finally, the *Tucker* decision a short time ago was cited for the proposition that the legislature retains discretion to determine the extent and definition of 'needy'. *Lovelace v. Gross*, 537 N.Y.S.2d 783, 784-85, 142 Misc.2d 605 (Sup. 1989).

"28. Plaintiffs also cite *Butte Community Union v. Lewis*, 745 P.2d 1128 (Mont. 1987), a decision construing a provision of the Montana Constitution. In that case, the Montana Supreme Court affirmed a trial court's findings that the legislative definitions for 'needy' were unreasonable. The record is this case does not support that conclusion.

"29. In short, the Defendant's changes in eligibility rules for GA/MediKan did not violate Article 7, Section 4 of the Kansas Constitution. This conclusion, however, must not be viewed as tacit acceptance of Defendant's argument that the changes reduced administrative costs associated with disability determinations, as the Defendant's employees continue to perform the same clerical tasks of reviewing physician statements for compliance with the new disability period. In addition, Defendant's argument that counties retain legislative authority to develop programs of aid for the needy ignores the language of K.S.A. 39-744 which transferred all county welfare powers to the Secretary.

## ARTICLE 7, SECTION 4 AND MEDIKAN

"30. With regard to the MediKan modifications, Plaintiffs argue that the

changes result in a program so inadequate as to be violative of Article 7, Section 4.

"The single Kansas decision which addresses the provision of medical care for the needy is *Caton & Starr v. Osborne County*, 110 Kan. 711 (1922). In that case, an indigent child was diagnosed as having a mastoid ailment. Her doctor determined that immediate surgery was required to save her life. The overseer of the poor transported her to Concordia, where a successful operation was performed. The bill for the operation was submitted to the commissioners of Osborne County (the girl's residence), but they refused to pay it. Suit was filed, and the trial court granted judgment in favor of the county.

"The Supreme Court noted that the statutes required a physician to notify a county commission in writing, when an indigent child was found to be afflicted with a malady or deformity necessitating surgery or hospitalization. Once that notice was supplied, the county board of health was required by law to transport the child to the hospital at the University of Kansas. In *Caton*, the notice had not been supplied and the child had been taken to another hospital.

"Despite these statutory requirements, the Supreme Court reversed the decision of the lower court:

'In view of the humane considerations which prompted enactments for the relief of the poor it is inconceivable that the legislature intended that afflicted children of the poor who required immediate medical or surgical treatment and whose lives would be lost for the lack of it, should be given no treatment or relief until the slow-moving machinery of the county board should be set in motion, and that tribunal should legally convene to determine the necessity for sending the child to the university hospital, and until it was transported there. . . . The constitution enjoins this care and commands that counties of the state shall provide for the poor and those who have claims upon the sympathy and aid of society. (Art.7, § 4) When an overseer of the poor finds a poor person in need of care, it is his duty to furnish him prompt and proper relief.' 110 Kan. at 713-714 (1922).

"31. Plaintiffs' claim as to the revised MediKan program is a bald assertion. Plaintiffs have provided no evidence as to the impact of the MediKan changes on any class member. They have provided no legislative, judicial, or policy rationale to support their conclusion that these MediKan changes are unconstitutional.

"The expansive language of the *Caton & Starr* decision must be viewed in context. That decision interprets a statute providing for surgical operations for children of the poor. K.S.A. 39-708c(5) simply directs the Secretary to develop plans financed by federal funds or state funds or both for providing medical care for needy persons.

"This is not to deny that the modified MediKan program is skeletal. One might argue that only those who remain healthy are served by it. Many

who suffer from severe or chronic illness will require medical services outside the limited scope of the program designed by the Secretary.

"32. The record in this case is that the MediKan modifications reflected a priority for primary care. No precise definition of 'primary care' is contained in the record. John Alquest, Chief of Service Delivery for S.R.S., testified that access to physician services was a first line of defense for health care. He did not recommend that hospital care be dropped from MediKan benefits.

"Hospital costs had grown to represent about two-thirds of the MediKan budget, affording service to a small part of the MediKan population. The working group assumed that hospitals would continue to serve those in acute need, even though MediKan no longer provided hospital benefits. A federal law requires that a hospital screen any patient who comes to an emergency department, to determine whether an emergency medical condition exists. If so, the hospital must stabilize the patient and may not generally transfer the patient to another hospital without the consent of the patient. One way S.R.S. hoped to encourage hospitals to provide care for GA recipients was to increase the payment rates for Medicaid. This would increase the federal funds received by the hospitals, thus at least theoretically giving them more flexibility to provide free care to people on GA. Another federal program, disproportionate share payments of additional dollars paid to those hospitals who serve an unusually high number of low income patients, is described in the record, but its significance in MediKan planning is not mentioned.

"33. The plaintiffs' position, in effect, seems to be that S.R.S. must provide all necessary medical assistance to the needy. Thus, Plaintiffs contend that the Secretary has no discretion as to the amount or type of medical aid to be provided. There is no authority for that position. Neither the state constitution nor our state statutes mandate that S.R.S. provide assistance on an individual basis or meet in full measure all the legitimate needs of each recipient. See *Bernstein v. Toia*, 43 N.Y.2d at 348. Plaintiffs here have failed to establish that the MediKan modifications were not reasonably expected to provide a fair measure of assistance to the GA population as a whole."

As we stated in *State ex rel. Secretary of SRS v. Jackson*, 249 Kan. 635, 644, 822 P.2d 1033 (1991), "[P]ublic assistance funds are ever in short supply, and public policy demands they be restricted to those without resources of their own." It is unfortunate that lean financial times for State revenues coincide with increased demand for public assistance, but such is inevitable.

The result reached herein does not mean that there is no point at which reduction in benefits and increases in eligibility requirements would ever be violative of Article 7, § 4 of the Kansas Constitution.

We turn now to the issue of whether the proposed amendments are violative of the Equal Protection Clauses of the Kansas and United States Constitutions.

Plaintiffs claim that defendant's acts violate the Equal Protection Clause of the 14th Amendment to the United States Constitution and the comparable provision of Section 1 of the Bill of Rights of the Kansas Constitution. Specifically, plaintiffs' argument is that defendant may not constitutionally reduce benefits or restrict eligibility under GA/Medikan while continuing to provide a large array of benefits to those who qualify for the federal programs such as SSI, AFDC, or Medicaid. Plaintiffs contend that the GA population is as needy as those who qualify for the federal programs, yet the latter receive significantly greater assistance.

In support of their contentions, plaintiffs state:

"Moreover, it must be kept in mind that the state is not required to participate in the federal AFDC and Medicaid programs. If the state does elect to participate in these programs and receive the federal funds which they make available, then it must comply with the federal standards for those programs. *Country Club Home, Inc. v. Harder*, 228 Kan. 756, Syl. ¶ 5, 620 P.2d 1140 (1980), rehearing denied, modified 228 Kan. 802, 623 P.2d 505 (1981); *Whisler v. Whisler*, 9 Kan. App. 2d 624, 629, 684 P.2d 1025 (1984). However, it is the state, not the federal government, which chooses to provide AFDC and Medicaid benefits to needy Kansans, and it is the state which determines the level of benefits to be provided under these programs, within the parameters established by the federal government as a condition of its financial participation. Unlike SSI, which is totally administered and funded by the federal government, AFDC and Medicaid are simply two programs which the defendant may elect to utilize in the course of carrying out her statutory and constitutional mandates. It is these state law mandates, rather than the purposes of the federal assistance programs, against which the legitimacy of the defendant's actions must be measured."

The 14th Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Section 1 of the Bill of Rights of the Kansas Constitution is given much the same effect. *Farley v. Engelken*, 241 Kan. 663, 667, 740 P.2d 1058 (1987). The equal protection guarantee does not preclude the State from classifying persons for purposes of legislation, but it does require that persons similarly situated be treated alike. *Stephenson v. Sugar Creek*

*Packing,* 250 Kan. 768, Syl. ¶ 2, 830 P.2d 41 (1992). The United States Supreme Court has described equal protection as a concept which "emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt,* 417 U.S. 600, 609, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974).

The district court held that there was no indistinguishable class between those who had eligibility under one of the federal programs and those who did not meet the criteria of eligibility therefor and were accordingly seeking GA and Medikan benefits. Because of this, there was no need to determine whether the rational basis test, the heightened scrutiny test, or the strict scrutiny test should be utilized in determining the issue. See *Stephenson,* 250 Kan. 768, for a discussion of the three tests. We agree. In seeking to satisfy particular federal goals, Congress has authorized programs designed to provide assistance to particular categories of individuals. The federal government fixed the parameters within which the programs operate. No state is required to participate. If a state elects to do so, its program must comply with the federal requirements. If a state comes under one of the programs, considerable federal funds are supplied toward the expenses of operation. Plaintiffs do not meet the eligibility requirements which are ultimately controlled by the federal government but administered through the state. No federal agencies are parties to this litigation, and no equal protection challenge is made to their requirements for eligibility or levels of benefits.

Plaintiffs, rather, contend that participation in the federal programs requires the State to grant the same level of benefits to needy persons not eligible for any of the federal programs. No persuasive authority is presented in support of this contention. We conclude no viable equal protection issue has been raised herein.

We find no error or abuse of discretion in the district court's denial of injunctive relief to plaintiffs and its entry of judgment in favor of defendant.

The judgment is affirmed.